Filed 11/5/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ESTEBAN VERA,<br><br>    Defendant and Appellant. | E069367<br><br>(Super.Ct.No. FWV17002549)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Kyle S. Brodie, Judge. Affirmed.

Anna Dorn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Daniel Rogers and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Esteban Vera was convicted of possessing one kilogram of a controlled substance that was discovered through a dog sniff during a traffic stop of his vehicle. An officer had stopped Vera due to a tinted-window infraction. We must

1

determine whether the dog sniff unconstitutionally prolonged his detention for that traffic stop, requiring suppression of the drugs under *Rodriguez v. United States* (2015) __ U.S.__, 135 S.Ct. 1609 (*Rodriguez*).  We affirm the trial court's denial of Vera's suppression motion.

## I.  FACTS

On June 22, 2017, City of Rialto police detective Joseph Maltese was driving in his patrol car with his narcotics-certified dog.  On Riverside Avenue in Rialto, Maltese observed a vehicle driving with windows that were illegally tinted, in violation of California Vehicle Code section 26708, subdivision (a).  Maltese directed the vehicle to stop, and both vehicles pulled into a lot and parked.

When Maltese approached the vehicle on foot from behind, he could not see through the rear window because it was so darkly tinted; the driver, Vera, was visible only through the driver's side rearview mirror.  Maltese asked Vera to drop the rear window, but Vera would not do so.  For Maltese's safety, he ordered Vera out of the car.

Maltese ordered Vera to walk to Maltese's patrol car, turn around, and put his hands on his head.  Maltese patted Vera down for weapons, finding a knife in Vera's pocket.  The knife appeared to be a switchblade.

Maltese asked Vera to sit on a curb, and he did.  He asked for Vera's driver's license, and Vera said it was in the glove compartment of his car.  Maltese asked for and received permission to retrieve the license, and he found it in the car.  Maltese also found the vehicle registration.

Around that time, another officer, Garcia, arrived. Garcia happened to be in the same parking lot and came as backup without being called. Maltese performed a records check on Vera, finding no warrants. Maltese also examined the knife and determined that it was not an illegal switchblade. During this time, Garcia made sure Vera was not going to run away or harm Maltese.

Maltese then asked Garcia to write the citation for the window tint violation and Garcia said "sure." Over the next 32 seconds, Maltese went to his patrol car, obtained both his citation book and his dog, and handed the citation book to Garcia. (The record contains a video from a body camera on Maltese that covers this time period.) After Maltese handed Garcia the citation book, Garcia began writing the citation. While Maltese retrieved his citation book and dog, and for about 40 seconds thereafter, Maltese repeatedly asked Vera for consent to search his car. Vera repeatedly said no. At the vehicle, the dog alerted on the trunk, and then alerted again on the interior dashboard. At the time that the dog was examining the car, Garcia was still writing the citation.

Maltese opened the trunk of Vera's car and found a blue duffle bag, to which the dog alerted. In the bag, Maltese found various bags of a substance that appeared to be methamphetamine, and he found additional bags in the center console of the car behind air vents. He weighed the substance in the duffle bag at over 4.5 kilograms, and he received a positive result upon field testing it for methamphetamine.

Vera was charged with felony possession for sale of a controlled substance, and he filed a written motion to suppress the drug evidence under Penal Code section 1538.5. Vera argued, among other things, that his traffic stop was unreasonably prolonged under

3

*Rodriguez.* After hearing testimony from Maltese and viewing the excerpt of the video of the stop from Maltese's body camera, the trial court denied the motion.

Vera later pled no contest to an amended information alleging possession of one kilogram of a controlled substance, reserving his right to appeal. He received a custody term of five years, of which two years were suspended and mandatory supervision by the probation department imposed.

## II. DISCUSSION

Vera's sole argument on appeal is that the methamphetamine found in his car must be suppressed because his traffic stop was unreasonably prolonged by the dog sniff, in violation of *Rodriguez.* We therefore explain *Rodriguez* and then apply it to the facts of this case. Because the relevant facts are not disputed, we exercise de novo review. (*People v. Stanley* (2017) 18 Cal.App. 5th 398, 402.) Ultimately, we reject Vera's claim and affirm.

### A. *Rodriguez*

Because the Fourth Amendment to the United States Constitution forbids only *unreasonable* searches and seizures, "an officer may stop and detain a motorist on reasonable suspicion that the driver has violated the law." (*People v. Wells* (2006) 38 Cal.4th 1078, 1082-1083; see, e.g., *Arizona v. Johnson* (2009) 555 U.S. 323, 330-331 [discussing United States Supreme Court cases permitting detention during traffic stops].)

During the execution of a lawful traffic stop, the police may have a trained dog sniff the driver's vehicle, typically to detect the presence of drugs. Even if they lack any reason to believe that the dog will alert, police officers may conduct a dog sniff without

implicating the Fourth Amendment, because a dog sniff is not a search at all. (*Illinois v. Caballes* (2005) 543 U.S. 405, 409 (*Caballes*); see *People v. Mayberry* (1982) 31 Cal.3d 335, 337 [dog sniff of luggage at airport not a search prohibited by Fourth Amendment].)

However, the Fourth Amendment nevertheless provides a limitation on a dog sniff performed in conjunction with a traffic stop. A detention that is justified solely by the governmental interest in issuing a traffic ticket to the driver "can become unlawful if it is prolonged" by the dog sniff "beyond the time reasonably required" to complete the mission of the traffic stop. (*Caballes*, *supra*, 543 U.S. at p. 407.)

In *Rodriguez*, *supra*, 135 S.Ct. at pages 1610-1613, the United States Supreme Court addressed a case where a dog sniff prolonged a lawful traffic stop by seven to eight minutes beyond the point at which the stop otherwise was complete. A police officer observed a vehicle being driven for one or two seconds onto the shoulder of a highway, in violation of state law. After stopping the vehicle for that traffic infraction, the officer questioned the driver about the incident; gathered his driver's license, registration, and proof of insurance; ran a records check; and then returned all the documents to the driver with a written warning. After that point, a second officer arrived with a trained dog that sniffed the vehicle, alerting to drugs seven or eight minutes after the warning was issued.

On these facts, the federal court of appeals held that the extension of the stop was "de minimis" and thus did not violate the Fourth Amendment. The Supreme Court, however, reversed, holding "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against

5

unreasonable seizures." (*Rodriguez*, *supra*, 135 S.Ct. at p. 1612.) The Court allowed no "de minimis" exception. (*Id.* at pp. 1615-1616.)

Central to the Court's analysis was its explanation of the "'mission'" of a traffic stop, which is "to address the traffic violation that warranted the stop . . . and attend to related safety concerns." (*Rodriguez*, *supra*, 135 S.Ct. at p. 1614.) The mission includes "determining whether to issue a traffic ticket" and "'ordinary inquiries incident to [the] stop.'" (*Id.* at p. 1615, quoting *Caballes*, *supra*, 543 U.S. at p. 408.) These "inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (*Rodriguez*, *supra*, at p. 1615.) The mission involves activities that serve the purpose of "enforcement of the traffic code" (*id.* at p. 1615) and the "safety precautions" that officers may need to take while doing so (*id*. at p. 1616).

A dog sniff is outside the mission of the traffic stop because it is a measure "aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" (*Rodriguez*, *supra*, 135 S.Ct. at 1615, quoting *City of Indianapolis v. Edmond* (2000) 531 U.S. 32, 40-41.) A dog sniff "is not fairly categorized as part of the officer's traffic mission." (*Rodriguez*, *supra*, at p. 1615.) "Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." (*Id.* at p. 1616.)

Because a traffic stop may "'last no longer than is necessary to effectuate'" the mission, "[a]uthority for the seizure thus ends" when the mission is completed "or reasonably should have been" completed. (*Rodriguez*, *supra*, 135 S.Ct. at p. 1614.) It

6

follows that a seizure of a driver is "'unlawful'" when a suspicionless dog sniff prolongs the detention "'beyond' that point." (*Id.* at p. 1616.)

The Court stated that the permissible duration of the stop is not to be measured by the reasonable duration of traffic stops in similar circumstances, but by the amount of time actually necessary to perform the stop expediently. (*Rodriguez*, *supra*, 135 S.Ct. at p. 1616.) A police officer does not earn "bonus time to pursue an unrelated criminal investigation" by proceeding rapidly. (*Ibid.*) "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" (*Ibid.*) Thus, the "critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop,' [citation]." (*Ibid.*)

B. *Rodriguez's Application to This Case*

We start by considering the record as to the time period from the outset of the traffic stop for Vera's tinted window infraction through the point where Detective Maltese asked Officer Garcia if he would write Garcia's citation for that infraction ("the initial period"). Our record does not contain a video from Maltese's body camera for this period, so the evidence of the events comes entirely from Maltese's testimony.

Under *Rodriguez*, Vera properly was detained for any time period necessary to perform the mission of the traffic stop. (*Rodriguez*, *supra*, 135 S. Ct. at p. 1616.) During the initial period, most of Maltese's actions were within that mission, as *Rodriguez* defines it. Maltese acted to ensure his safety by ordering Vera out of the car, patting him down, and asking him to sit on a curb. Maltese obtained Vera's identification documents

7

from his car and performed a warrant check, both of which were within the mission.  It was constitutional to detain Vera for these mission-related actions.

One officer action during the initial period was not part of the traffic stop's mission.  Around the time that he performed the warrant check, Maltese spent some time investigating the legality of the knife he found in Vera's pocket, which appeared that it could be an illegal switchblade.  But a stop may be prolonged "if the prolongation itself is supported by independent reasonable suspicion."  (*United States v. Evans* (9th Cir. 2015) 786 F.3d 779, 788.)  Here, such reasonable suspicion justified prolonging the traffic stop for the brief time Maltese took to investigate the knife.

We next consider the time period beginning with Maltese's request that Garcia write the tinted-window citation ("the dog sniff period").  Our record contains a portion of the video from Maltese's body camera, covering one minute and 26 seconds beginning with that request, so the evidence about the dog sniff period comes from the video as well as Maltese's testimony.

The critical issue here is whether the dog sniff extended Vera's detention for longer than it would have lasted without the dog sniff—including the time for issuing the citation.  That is, the yardstick for measuring whether the dog sniff prolonged Vera's detention is the length of time of that detention had Maltese written the citation himself without the dog sniff.  (See *United States v. Stewart* (7th Cir. 2018) 902 F.3d 664, 675 ["salient question" under *Rodriguez* was whether stop was longer than if officer had "simply written" a citation without the dog sniff; government must ask officer "if he could have finished writing the ticket" in the time the sniff was conducted].)

8

Vera thus is misguided in arguing "Officer Maltese had already finished the mission of the traffic stop—to write a citation for illegally tinted windows—when he transmuted the stop into a drug trafficking investigation . . . . Officer Maltese had finished all aspects of the traffic stop when he began the dog sniff . . . ." The mission of the traffic stop was in fact not finished when the dog sniff began, because the citation had not yet been written. (See *Rodriguez*, *supra*, 135 S.Ct. at p. 1612 [referring to the mission "of issuing" a ticket for the violation, quoting *Caballes*, *supra*, 543 U.S. at p. 407].)

We thus must closely examine what Maltese did instead of simply writing the citation. Rather than write the citation himself, Maltese asked Garcia to write it and then returned to his vehicle and procured both his citation book and his dog. The video shows that it took Maltese only about 32 seconds to obtain the book and dog and hand the book to Garcia. Because this was so quick, we have no reason to conclude that it would take any less time for Maltese to obtain the citation book for himself, if Maltese was writing the citation himself without using the dog to examine the vehicle. Up through the point where Maltese handed the citation book to Garcia, we have no reason to conclude that the dog sniff extended the stop.

Although Maltese repeatedly asked Vera for consent to search the vehicle, which was outside the mission of the stop, he began to do so during the time that he was retrieving the citation book and handing it to Garcia. This questioning during this 32 seconds occurred during the traffic stop without prolonging it.

9

Maltese continued to unsuccessfully request Vera's consent for about 40 seconds after he handed the citation book to Garcia, and then Maltese and the dog began to examine the car. The video ends at this point, before the dog actually alerted and thereby indicated the presence of narcotics. The record does not reveal precisely how much time it took the dog to alert; Maltese's uncontroverted testimony is that the dog alerted to the trunk of the vehicle when Garcia was still filling out the citation. Once the dog alerted to the vehicle, there was independent reasonable suspicion for Maltese to prolong Vera's detention to search for drugs. Because the only evidence we have is that the dog alerted before the citation was issued, this chronology—without more—indicates that the use of the dog did not extend the length of Vera's detention.

It does not necessarily end the inquiry that the dog alerted before the citation was issued. Vera could demonstrate that the dog alert came after the time at which the citation *reasonably should have been issued* had there been no dog sniff. (*Rodriguez*, *supra*, 135 S.Ct. at p. 1614 ["Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."].) But this Vera did not do. The dog sniff began about 72 seconds after Maltese proceeded to his car to retrieve the citation book, and about 40 seconds after he handed the book to Garcia. The dog may have alerted to the trunk shortly after that; Vera has not established any length of time that it took the dog to alert. Vera also did not establish how long it takes Maltese (or Garcia) to write a citation. Vera did not establish that Garcia took more time than usual to write it. On this record, we cannot conclude that the dog alert occurred after the citation reasonably should have been issued.

10

The record therefore provides us no reason to conclude that Vera's traffic stop was unconstitutionally prolonged by the use of a dog to sniff his vehicle.

### III.  DISPOSITION

The judgment of conviction is affirmed.

CERTIFIED FOR PUBLICATION

RAPHAEL
_____
J.

We concur:

RAMIREZ
_____
P. J.

MILLER
_____
J.