Filed 5/24/21  P. v. Ochoagomez CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JULIO OCHOAGOMEZ,<br><br>    Defendant and Appellant. | B304504<br><br>(Los Angeles County<br>Super. Ct. No. BA467555) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sergio C. Tapia, Judge.  Affirmed.

Richard B. Lennon and Melissa L. Camacho-Cheung, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Julio OchoaGomez challenges the trial court's denial of his motion to suppress evidence seized during a traffic stop that ultimately resulted in OchoaGomez's conviction for possession of a controlled substance.  OchoaGomez argues that the police unlawfully prolonged the traffic stop beyond the time in which a reasonably diligent officer would have completed the mission of the stop, thereby violating his Fourth Amendment right to be free of unreasonable seizure under *Rodriguez v. United States* (2015) 575 U.S. 348 (*Rodriguez*).  We hold that, based on the factual findings supported by substantial evidence in the record, the detaining officer was diligent in his efforts to complete the mission of the traffic stop and had not yet completed that mission at the time his police dog alerted him to the presence of drugs in OchoaGomez's vehicle.  As such, the court did not err in denying the motion to suppress.

OchoaGomez also challenges the court's use of his prior juvenile adjudication to increase his sentence under California's "Three Strikes" law (Pen. Code, §§ 667, subds. (b)−(i), 1170.12, subds. (a)−(d)).  He acknowledges that *People v. Nguyen* (2009) 46 Cal.4th 1007 (*Nguyen*) permits use of a juvenile adjudication as a prior strike, but argues *Nguyen* is no longer controlling law, because its reasoning has been fatally undermined by subsequent United States and California Supreme Court decisions regarding judicial factfinding and the Sixth Amendment right to a jury trial.  (See *Mathis v. United States* (2016) 579 U.S. ___ [136 S.Ct. 2243, 195 L.Ed.2d 604] (*Mathis*); *Descamps v. United States* (2013) 570 U.S. 254 (*Descamps*); *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*).)  We disagree that these decisions are inconsistent with *Nguyen*, as they address judicial factfinding on previously unadjudicated facts, an issue implicated neither in

*Nguyen*, nor in the instant appeal.  As such, the trial court did not err in its application of OchoaGomez's prior juvenile adjudication as a strike at sentencing.

Accordingly, we affirm.

## FACTS AND PROCEEDINGS BELOW

### A.  *Traffic Stop Resulting in OchoaGomez's Arrest*

The following facts related to the traffic stop leading to OchoaGomez's arrest are reflected in the police body camera footage from the stop, as well as the detaining officer's uncontradicted testimony at the preliminary hearing.

At about 9:30 in the morning of April 24, 2019, California Highway Patrol Officer Richard Cheever initiated a traffic stop of OchoaGomez's vehicle based on OchoaGomez following a tractor trailer too closely and having tinted front windows, both violations of the Vehicle Code.  (See Veh. Code, §§ 21703, 26708, subdivision (a)(1).)  Cheever is a K-9 handler and had his trained police dog in the car with him.  After both Cheever and OchoaGomez exited the freeway and parked, Cheever approached the right front passenger side door of the car.  Cheever told OchoaGomez the reason for the stop and asked for his driver's license, vehicle registration, and insurance.  Cheever noticed that OchoaGomez's hands were trembling as he handed over his documents and noticed a  "strong odor of air freshener emitting from the interior of the vehicle."  Cheever later testified that, in his experience, most individuals have trembling hands or other signs of nervousness at the beginning of a traffic stop, and that "air freshener is commonly used by drug traffickers to mask the odor of a substance that they may be transporting in the vehicle."

Three minutes and 44 seconds into the body camera footage of the traffic stop, Cheever returned to his patrol car with OchoaGomez's documents. Approximately two minutes later, he initiated a check of the vehicle registration. A Bell Gardens police officer then arrived as standby, but did not interact with OchoaGomez. Approximately a minute after Cheever had requested the registration check, he also requested a check on OchoaGomez's license. Approximately a minute after that—and approximately eight minutes and 30 seconds into the traffic stop—Cheever also requested a check for any outstanding warrants. Cheever later testified he requested the warrant check because it is what he "normally [does] in a traffic stop." While in the car, Cheever filled out a consent to search form. He did not write a traffic citation at that time, because he "inten[ded] to wait for the completion of the warrant check before [he] started writing anybody a ticket."

Around three minutes after he requested the warrant check—and approximately 11 minutes and 20 seconds into the traffic stop—Cheever returned to OchoaGomez's car, directed him to exit, and frisked him. He then led OchoaGomez back toward his patrol car and asked him what he was doing in Bell Gardens, if he had any firearms, and whether he was on probation. OchoaGomez said he had been on probation for a gun charge when he was younger. Cheever then asked OchoaGomez if he would consent to a search of his vehicle with the police dog. OchoaGomez replied, "whatever . . . go ahead." This occurred approximately 12 minutes and 15 seconds into the stop, at which point Cheever "was still waiting for the warrant check to return." Cheever then confirmed OchoaGomez could read and understand English, and asked him to review the consent form, and stated "if

4

you have any [*sic*] understanding you can ask me some questions." OchoaGomez indicated that he had read and understood the form, but refused to sign. Cheever wrote " 'declined to sign the consent form' " across the form.

Cheever then retrieved his dog from the patrol car and began an exterior sniff of the car. He walked the dog around the car, and the dog looked in the open right front window and sat down. Based on the dog's training and Cheever's experience with him, Cheever understood sitting to mean the dog detected the presence of drugs. At this point—approximately 15 minutes into the traffic stop and approximately six and a half minutes after Cheever had asked dispatch to check for outstanding warrants—the body camera footage does not reflect that Cheever had received a response to the warrant check.

Cheever let the dog into the interior of the car, then opened the trunk. Inside the trunk, Cheever found a duffel bag, which contained twenty packages of what appeared to be methamphetamine. Cheever ultimately arrested OchoaGomez. The body camera footage does not reflect a response to Cheever's request for a warrant check.

## B.    *Preliminary Hearing and Motion to Suppress*

OchoaGomez moved to suppress all physical evidence obtained as a result of the traffic stop, pursuant to Penal Code section 1538.5. The court heard the motion at the preliminary hearing, during which Cheever testified and the court watched the body camera footage of the traffic stop. No other evidence was offered regarding the motion to suppress.

The court denied the motion. The court found Cheever's testimony credible and more specifically stated it believed Cheever's testimony that he was "still waiting for the return of

the warrant check" approximately 15 minutes into the traffic stop when the police dog alerted Cheever to the presence of drugs. The court concluded Cheever had conducted the dog sniff within the time reasonably necessary to complete the initial purpose of Cheever's traffic stop, and thus that the dog sniff had not prolonged the stop in a manner that would violate OchoaGomez's federal constitutional rights.

Following the preliminary hearing, OchoaGomez was charged with possession for sale of a controlled substance in violation of Health and Safety Code section 11378 (count 1), and sale/offer to sell/transportation of a controlled substance in violation of Health and Safety Code section 11379, subdivision (a) (count 2). The information further alleged that, as to both counts, the substance containing methamphetamine exceeded 10 kilograms within the meaning of Health and Safety Code section 11370.4, subdivision (b)(3). The information also alleged a juvenile adjudication (see Pen. Code, § 211) as a strike under California's Three Strikes law.

### C. *Plea Agreement and Sentencing*

Pursuant to a plea agreement, OchoaGomez waived his right to a jury trial, pleaded guilty to count 1, and admitted to having a prior juvenile adjudication. Also pursuant to the plea agreement, the second count in the information was dismissed.

The court sentenced appellant to a total of six years in state prison, calculated as follows: the middle term of three years for the single count, doubled to six years for the strike prior.

Appellant filed a timely notice of appeal based on the denial of his motion to suppress evidence and the sentence imposed by the trial court.

6

# DISCUSSION

## A. *Motion to Suppress*

OchoaGomez first challenges the court's denial of his motion to suppress. In reviewing the denial of a motion to suppress, we must accept all facts in favor of the ruling, including all reasonable inferences and deductions, if supported by substantial evidence. (*People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1227.) "[T]he ' "reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security" ' is the guiding principle." (*People v. Grant* (1990) 217 Cal.App.3d 1451, 1458.)

### 1. Applicable law

The Fourth Amendment to the United States Constitution ensures the right of all "people to be secure in their persons . . . against unreasonable searches and seizures." (U.S. Const., 4th Amend.) Temporary detention of individuals during the stop of an automobile by the police constitutes a seizure of persons within the meaning of the Fourth Amendment. (*Whren v. United States* (1996) 517 U.S. 806, 809−810.) "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the [stop's] 'mission[,]' " which is "to address the traffic violation that warranted the stop, [citation] and attend to related safety concerns, [citations] . . . Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." (*Rodriguez, supra,* 575 U.S. at p. 354.) In *Rodriguez,* the United States Supreme Court expressly identified tasks that serve the mission of a traffic stop as follows: "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to

7

[the traffic] stop.' [Citation.] Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (*Id.* at p. 355.) The Supreme Court explained that such checks are included in the scope of an officer's mission in conducting a traffic stop because they "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly," given that, for example, "[a] 'warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.' " (*Ibid.*) *Rodriguez* also ties warrant checks to officer safety concerns during traffic stops by citing authority it describes as "recognizing [the] officer safety justification for criminal record and outstanding warrant checks." (*Id.* at p. 356, citing *United States v. Holt* (10th Cir. 2001) 264 F.3d 1215, 1221-1222.)

Under these principles, the scope or duration of a traffic stop " 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the [traffic] violation" leading to the stop (*Rodriguez, supra,* 575 U.S. at pp. 350–351), a mission that includes the tasks of checking the driver's license, registration, and insurance, checking for outstanding warrants, and those minimally burdensome measures necessary to assure the officer's safety. (*Id.* at p. 355; see *People v. Vera* (2018) 28 Cal.App.5th 1081, 1087−1088 (*Vera*) [officer conducting traffic stop "obtained [defendant]'s identification documents from his car and performed a warrant check, both of which were within the mission" of the stop].)

*Rodriguez* does not foreclose the police from performing investigative efforts during a traffic stop that are unrelated to the stop's mission, however. (See *Rodriguez, supra*, 575 U.S. at pp. 355−356.) Rather, "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop" as long as the officer does "not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." (*Id.* at p. 355.) For example, a dog sniff of a vehicle to detect the presence of drugs is not related to the mission of any traffic stop, but "[d]uring the execution of a lawful traffic stop, the police may have a trained dog sniff the driver's vehicle . . . without implicating the Fourth Amendment," as long as the traffic stop is not " 'prolonged' by the dog sniff 'beyond the time reasonably required' to complete the mission of the traffic stop." (*Vera, supra*, 28 Cal.App.5th at pp. 1085–1086.)

### 2. Cheever did not prolong the traffic stop beyond the time reasonably necessary to complete its mission, as *Rodriguez* defines it

OchoaGomez argues that the traffic stop at issue here exceeded the reasonable amount of time necessary for Cheever to complete the mission of the traffic stop, because (1) Cheever prolonged the stop beyond the amount of time reasonably necessary to complete its mission by seeking consent to search the vehicle and performing an external dog sniff of the vehicle, and (2) Cheever did not diligently pursue the mission of the stop. We disagree.

The trial court found Cheever was still waiting for the results of the warrant check when he prepared the consent form, when he asked OchoaGomez questions unrelated to the

traffic stop mission, and when he had his dog sniff the outside of the vehicle. Nothing in the record suggests otherwise; to the contrary, the body camera footage and Cheever's testimony, which the court deemed credible, constitute substantial evidence to support the court's finding. Because, under *Rodriguez*, performing a warrant check is within the proper scope of an officer's mission in conducting a traffic stop, Cheever did not prolong the stop by conducting additional investigative activities while still waiting for the results of that search to return— even absent reasonable suspicion to separately justify those investigative activities. (*See Rodriguez, supra,* 575 U.S. at p. 355; *Vera, supra*, 28 Cal.App.5th at p. 1088−1089 [performing a dog sniff of defendant's vehicle during a traffic stop did not violate Fourth Amendment under *Rodriguez* because the dog alerted when "[t]he mission of the traffic stop was in fact not finished" and before it "reasonably should have been" finished, italics omitted].)

OchoaGomez argues that running warrant checks is only sometimes within the proper scope of a traffic stop, relying on the Supreme Court's use of the word "typically" to introduce the list of ancillary efforts involved in such a stop. (*Rodriguez, supra,* 575 U.S. at p. 355 ["[A]n officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' [Citation.] *Typically* such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," italics added.].) Under OchoaGomez's interpretation, however, checking to assure a motorist has a valid driver's license would also only sometimes be within the scope of a traffic stop, and—perhaps more troubling—the

Supreme Court's detailed discussion of a traffic stop's mission in *Rodriguez* would provide no guidance as to when this is the case. OchoaGomez's proposed interpretation of *Rodriguez* is also inconsistent with the opinion's clear statement that warrant checks serve the purpose of a traffic stop (ensuring compliance with the Vehicle Code by checking for outstanding traffic violations), as well as its citation to the proposition that warrant checks promote officer safety during a traffic stop. (*Id.* at pp. 355−356.) We decline to adopt OchoaGomez's forced interpretation of *Rodriguez*.

In arguing to the contrary, OchoaGomez argues that *Rodriguez*'s discussion of an officer needing to be diligent in pursuing the mission of a traffic stop (*Rodriguez*, *supra*, 575 U.S. at p. 357), "breathes new life in[to] a line of pre-*Rodriguez* California cases," which hold that all warrant checks reflect investigative activity unrelated to the mission of a traffic stop. (See *People v. McGaughran* (1979) 25 Cal.3d 577, 585−587 (*McGaughran*); *People v. Brown* (1998) 62 Cal.App.4th 493, 498 [citing *McGaughran* for the proposition that "investigative activities beyond the original purpose of a traffic stop, including warrant checks, are permissible as long as they do not prolong the stop"]; see, e.g., *People v. Gallardo* (2005) 130 Cal.App.4th 234, 238 [same]; *People v. Castaneda*, *supra*, 35 Cal.App.4th at p. 1228 [same].) But this idea is inherently inconsistent with *Rodriguez*'s express conclusion that warrant checks are "typical[ ]" components of a traffic stop. (*Rodriguez, supra,* at p. 355.) Post-*Rodriguez,* these cases are thus of no assistance to OchoaGomez in arguing a warrant search is not part of the mission of a traffic stop.

11

We must also consider, however, whether Cheever was diligent in pursuing the mission of the traffic stop, such that the stop did not last longer than the amount of time in which the mission "reasonably should have been" completed. (*Rodriguez, supra*, 575 U.S. at p. 354; see *Vera, supra*, 28 Cal.App.5th at p. 1089 [that dog sniff occurred before mission of traffic stop completed does not end Fourth Amendment inquiry under *Rodriguez*].) OchoaGomez argues Cheever was not diligent, because Cheever never even started writing a citation during the approximately 15 minutes before the dog alerted.[1] But the court credited Cheever's testimony that he did not want to prepare a citation until he had confirmed whether OchoaGomez had any outstanding warrants. We must defer to the trial court on the credibility of this uncontradicted testimony. (See *People v. Leyba* (1981) 29 Cal.3d 591, 596–597). In any event, nothing in the record suggests Cheever's stated reason for not immediately writing a citation was disingenuous. OchoaGomez does not cite any authority suggesting that, as a general rule, waiting for the results of a warrant check before writing a citation reflects a lack of diligence in pursuing the mission of a traffic stop. Nor does OchoaGomez cite any authority suggesting that the amount of time Cheever waited for the results of the warrant check was so long that it might render his decision not to start writing the ticket unreasonable.

---

[1] OchoaGomez does not dispute that, once the dog alerted Cheever to the possible presence of drugs in the vehicle, Cheever had reasonable suspicion to justify further detention. (See *Vera, supra*, 28 Cal.App.5th at p. 1089 ["[o]nce the dog alerted to the vehicle, there was independent reasonable suspicion for [the officer] to prolong [defendant's] detention to search for drugs"].)

OchoaGomez repeatedly notes that the results of the warrant check "never produced an answer at all," apparently implying that this somehow renders the warrant search pretextual. But it makes sense that law enforcement's focus shifted away from the warrant search when Cheever found a large quantity of what appeared to be methamphetamine and arrested OchoaGomez. Thus, the fact that no response to the warrant check is reflected in the record—at least absent some other indication that the warrant search request was pretextual or that Cheever facilitated such lack of results—does not assist OchoaGomez's arguments.

Finally, the overall time of the traffic stop—approximately 15 minutes—is not, absent some other indication of delay or improper motive, inherently too long for a diligent officer to complete the mission of explaining a traffic violation, obtaining an individual's license, registration, and proof of insurance, running checks on these documents as well as a check for outstanding warrants, and executing a citation, all while taking reasonable measures to maintain the officer's safety.

### 3. Cheever did not exceed the permissible scope of the traffic stop by ordering OchoaGomez to exit the car

As noted, minimally burdensome measures that may be necessary to assure the officer's safety in pursuing the mission of a traffic stop, such as requesting the individual to exit the vehicle, are also within the scope of an officer's mission. (*Rodriguez, supra,* 575 U.S. at pp. 350–351; see *Vera, supra,* 28 Cal.App.5th at p. 1088.) The United States Supreme Court has contrasted such precautions taken to complete *the traffic stop* safely with "safety precautions taken in order to facilitate"

"[o]n-scene investigation into other crimes," noting the latter variety "detours from th[e] mission [of the traffic stop]." (*Rodriguez, supra,* at p. 356.)  In *Rodriguez,* for example, the officer ordered the defendant to exit his car in order to facilitate the dog sniff the court ultimately concluded violated the Fourth Amendment.  OchoaGomez argues this case presents a similar situation.  But in *Rodriguez,* the Fourth Amendment violation stemmed from the fact that these efforts investigating other crimes (the exit order and dog sniff) *prolonged* the traffic stop beyond the amount of time necessary to complete the mission of the traffic stop (see *id.* at pp. 356–357); indeed, in *Rodriguez,* the officer had already issued the citation when he ordered the defendant to exit the car and performed the dog sniff.  (*Id.* at p. 352.)  Here, by contrast, even if Cheever ordered OchoaGomez out of the vehicle purely to facilitate the dog sniff, this occurred before Cheever had completed the mission of the traffic stop and within an amount of time reasonably necessary to complete the mission of the traffic stop.  (See Discussion *ante,* part A.2.)  It thus does not run afoul of the Fourth Amendment under *Rodriguez.*  (See *Vera, supra,* 28 Cal.App.5th at p. 1088–1089.)

### B.  *Use of Prior Juvenile Adjudication as a Strike at Sentencing*

OchoaGomez also challenges the court's sentencing order.  He argues that consideration of his prior juvenile adjudication as a strike violated his right to a jury trial, because juvenile adjudications are not made by a jury.  OchoaGomez's argument presents a purely legal issue, which we review de novo.  (See *People v. Brooks* (2018) 23 Cal.App.5th 932, 941.)

The California Supreme Court in *Nguyen, supra,* 46 Cal.4th 1007, held that juvenile adjudications may be used as strikes

14

"even though there was no right to a jury trial in the juvenile proceeding." (*Id.* at p. 1010.) The court rejected the defendant's claim that *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) barred the use of a juvenile adjudication as a strike. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490, italics added.) In *Nguyen,* the literal rule of *Apprendi* had not been violated, and the defendant had waived his right (under California law) to a jury determination on the question of whether he had suffered the prior juvenile adjudication.[2] (*Nguyen, supra,* 46 Cal.4th at p. 1015.) Nevertheless, the defendant claimed—as does OchoaGomez in the instant appeal—that "the lack of a jury-trial right in the *prior juvenile proceeding* precludes *all use* of the resulting adjudication to enhance the maximum sentence for his current offense." (*Id.* at p. 1016.) The California Supreme Court disagreed, explaining that "*Apprendi* and its progeny concern an *adult*'s right to jury findings, in the adult case, of all previously unadjudicated facts that bear upon the maximum sentence for the adult offense." (*Id.* at p. 1024.) Since the facts of the

---

[2] California law provides that "[w]henever, for purposes of enhancing the sentence on current charges, the prosecution alleges a prior conviction sustained by the defendant, and the defendant disputes the allegation, the question whether he or she 'has suffered' the prior conviction must, unless a jury is waived, be submitted to a jury in the current proceeding. (§§ 1025, subds.(a), (b), 1158.) This jury-trial requirement would extend, of course, to a prior juvenile adjudication included within the Three Strikes law's definition of a 'prior felony conviction.' " (*Nguyen, supra*, 46 Cal.4th at p. 1015.)

adult defendant's juvenile offense in *Nguyen* had been previously adjudicated in the prior juvenile proceedings, the use of the juvenile adjudication as a strike did not violate the defendant's Sixth Amendment rights. (*Ibid.*)

OchoaGomez argues that *Nguyen* has been fatally undermined by the United States Supreme Court's subsequent decisions in *Descamps, supra,* 570 U.S. 254, and *Mathis, supra,* 136 S.Ct. 2243, as well as the California Supreme Court's subsequent decision in *Gallardo, supra,* 4 Cal.5th 120. Division Two of this court rejected these exact arguments in *People v. Romero* (2019) 44 Cal.App.5th 381, 389 (*Romero*), review denied Apr. 15, 2020, S260356, cert. denied sub nom., *Romero v. California* (2020) 141 S.Ct. 633. *Romero* explained that *Gallardo*, *Descamps* and *Mathis* "do nothing to undermine the premise of . . . *Nguyen* because they did not concern the possibility of using the fact that a defendant incurred a juvenile adjudication to enhance a defendant's sentence for a subsequent crime. Instead, those cases strictly prohibited factfinding by the sentencing court *beyond* the fact of a prior conviction." (*Romero, supra*, at p. 389, italics added.) We agree with our colleagues in Division Two and reject OchoaGomez's arguments for this same reason.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



BENDIX, J.