Filed 6/22/26  P. v. Morfin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084801 |
| Plaintiff and Respondent, | (Super. Ct. No. SCS323880) |
| v. | |
| MARCOS MORFIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael J. Popkins, Judge.  Reversed.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Police stopped defendant Marcos Morfin for driving with a broken taillight.  Morfin promptly provided his driver's license and complied with

officer directions to exit the vehicle and submit to a pat-down. After about a nine-minute detention, during which officers questioned Morfin and made no effort to begin writing him a traffic ticket, an officer saw heroin in plain view inside Morfin's vehicle. Morfin was charged with several drug offenses. After his motions to suppress were denied, Morfin pleaded guilty to all charges and the trial court granted him probation.

On appeal, Morfin contends the trial court erred by denying his renewed motion to suppress because the police improperly prolonged his detention to conduct a criminal investigation unrelated to the purpose of the initial traffic stop. We agree and reverse the judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Charges

On October 13, 2022, the People filed a complaint charging Morfin with five offenses:  two felony counts of transporting a controlled substance for sale with a prior offense (Health & Saf. Code, §§ 11352, subd. (a), 11370, subd. (a)); two felony counts of possession of a controlled substance for sale with a prior offense (*id*., §§ 11351, 11370, subd. (a)); and one misdemeanor count of possession of a controlled substance (*id*., § 11377, subd. (a)).  The complaint further alleged Morfin suffered several probation-denial priors and a strike prior.

2

## B. Preliminary Hearing and Initial Suppression Motion

### 1. The People's Evidence

National City Police Department Officer German Palma testified at the preliminary hearing about the events that led to the current charges. Footage from the officer's body-worn camera was played for the court.[1]

Around 10:00 a.m. on October 7, 2022, Officer Palma—a member of his department's Gang Enforcement Team—was patrolling the 100 block of National City Boulevard. The officer observed a 2001 Ford Expedition driving with a broken taillight, a Vehicle Code violation. While driving behind the Expedition, Officer Palma saw the driver (later identified as Morfin) "immediately [light] a cigarette and start[] smoking it, looking back at [the officer] on the side of the mirror, and then moving things around him and all around the center console." Based on his training and experience, Officer Palma believed these actions "show[ed] a consciousness of guilt." The furtive movements suggested Morfin was "trying to hide something," and smoking a cigarette suggested that Morfin believed he was about to be taken to jail. Officer Palma stopped Morfin for the taillight infraction.

Officer Palma approached Morfin and explained the reason for the traffic stop. Morfin appeared nervous and his hands were shaking. Officer Palma asked if Morfin was on probation or parole and Morfin stated he was not. The officer then asked for identification and Morfin presented his driver's license. After explaining that "dispatch [was] all busy" and that they would have to wait, the officer asked again whether Morfin was, or ever had

---

1    We, too, watched the footage.

been, on probation or parole. Morfin responded that he had previously been on federal probation for an ammunition offense.

After speaking to dispatch, Officer Palma asked Morfin to exit his vehicle while they waited to hear back about Morfin's probation status. Morfin asked, "So am I getting a ticket or what?" Officer Palma responded that he would "determine all that" after he confirmed whether Morfin was on probation or had any outstanding warrants. The officer testified that he asked Morfin to exit the vehicle for "a cursory pat-down for weapons" for officer safety because Morfin was "wearing baggy clothing" that prevented the officer from determining whether Morfin was armed.

As Morfin prepared to exit, he continued to exhibit nervous behavior. "He started to grab a charger cord and different things that it seemed like he was going to try to grab and move. He was hitting his forearm with the charger cord for some reason, which was very odd behavior." Officer Palma asked Morfin why he was "acting all nervous." Morfin, who appeared to be trying to charge his cellphone, said he did not have any weapons. Morfin exited the vehicle, leaving the driver's door open.

Outside the vehicle, Officer Palma handcuffed Morfin.[2] When Morfin asked why he was being handcuffed, the officer responded, "You are detained. This is a traffic stop. I already told you why I stopped you. I got to make sure you don't have weapons." Morfin reiterated that he had no weapons. Officer Palma added, "You told me you used to be on probation. I got to make sure you're not."

---

[2] Officer Palma testified that he handcuffs drivers "[a]lmost every single time when [he] conduct[s] traffic stops if [he] believe[s] they might be armed or are concealing anything."

4

Officer Palma patted-down Morfin and confirmed he did not have any weapons. The officer had Morfin sit on the curb, still handcuffed.

A second police officer asked Morfin for his name and Morfin identified himself.[3] The second officer told Morfin, "Oooh, I know you." Morfin responded that the officer was probably mistaking Morfin for his brother, as Morfin was from National City "a long time ago" but had not lived there in 15 years. Officer Palma testified that, based on his training and experience, when someone "say[s] they are *from* the city, they are referring to being from Old Town National City gang." (Italics added.) Dealing with gang members increases the risk to officer safety because "gang members often carry weapons." Officer Palma told Morfin, "I'm just waiting on my dispatch."

About four or five minutes into the traffic stop, Officer Palma still had not received confirmation from dispatch regarding Morfin's probation status. Officer Palma testified that people lie "very often" about their probation status, which is why he always confirms the status with dispatch. Officer Palma used his cellphone to review Morfin's criminal history as both officers continued to question Morfin about gang membership and a previous traffic stop for a cracked windshield.

As of about six minutes into the detention, Officer Palma still had not begun writing a traffic citation. He testified about this state of the detention, "I'm still conducting my investigation . . . . [¶] . . . [¶] What I started was a field interview."

Around seven minutes into the detention, the second officer appeared to check his in-car computer and then inform Officer Palma that Morfin's

---

[3] The second officer is not identified by name in the appellate record.

records were valid. Both officers continued to question Morfin and neither officer began writing him a ticket.

The second officer told Morfin that Morfin appeared nervous and that his actions were suspicious. Officer Palma asked for consent to search Morfin's vehicle, adding, "I'm not the dope police. [¶] . . . [¶] I don't care about a little dope." Morfin responded that he "always get[s] nervous" during traffic stops, that he had "nothing to hide," but denied consent to search. Morfin added, "If I'm getting a ticket sir, I'd like to get my ticket so I can be on my way."

Around nine minutes into the traffic stop, Officer Palma asked the second officer to continue getting Morfin's information so Officer Palma could "pat down" Morfin's vehicle. Officer Palma walked toward Morfin's vehicle and saw "in plain sight" through the open driver's door a "black tar substance" in a plastic baggie on the center console. Based on his training and experience, Officer Palma believed the substance was heroin.

Officer Palma searched Morfin's vehicle and found the following controlled substances: "a white crystalline substance . . . believed to be methamphetamine" in "a tin container on the front passenger floorboard"; "a white powdery substance . . . believe[d] to be cocaine" inside a plastic baggie in a zippered pouch in the back of the vehicle; and "baggies that contained a circular pill" that Officer Palma "believe[d] to be fentanyl." Officer Palma also found two scales in the driver's door pocket. Police later tested and weighed the substances and confirmed there were 4 grams of heroin, 1.9 grams of crystallized methamphetamine, and 33.1 grams of cocaine.[4] Officer Palma testified these were all usable amounts of the substances.

---

[4] The People did not charge Morfin in connection with the fentanyl.

The officers arrested Morfin and searched him incident to the arrest. They found about $820 in $20 bills in his pants pocket. When Officer Palma asked Morfin "whether he was selling th[e] controlled substances" found in his vehicle, Morfin "nodded his head in the affirmative."

On cross-examination, Officer Parma acknowledged that the underlying traffic infraction could result in either a warning or a "fix-it ticket." The officer testified that "to actually write" a taillight ticket takes "maybe two minutes or more . . . if [drivers] have their accurate information with them."

A National City Police Department narcotics detective testified that the controlled substances found in Morfin's vehicle were possessed for sale. He based this conclusion on the quantities of the substances, the presence of scales, and the amount of cash in Morfin's pocket.

## 2. Suppression Motion

Morfin moved to suppress the People's evidence on the basis it was obtained during an unjustifiably prolonged detention. Morfin's counsel argued that Officer Palma—a gang task force member—had no interest in pursuing the traffic infraction that gave rise to the detention and instead used the pretextual stop as a "fishing expedition" to search Morfin's vehicle for drugs. The attorney maintained the detention was unjustifiably prolonged because Morfin promptly provided his driver's license yet was handcuffed and placed on the curb for several minutes.

The prosecutor countered that the stop was based on a valid traffic violation and that the detention was justifiably prolonged based on Morfin's nervous behavior before and during the traffic stop. The prosecutor also noted that Morfin's baggy clothing, parole history, and possible gang

membership further justified the pat-down and prolonged detention to ensure officer safety.

The magistrate denied the suppression motion. The magistrate acknowledged that Morfin "ma[d]e some good points," including that it seems "most unusual" that Officer Palma "would acknowledge that he's putting people in handcuffs almost all the time after a car stop."[5] But the magistrate concluded that under the circumstances—including Morfin's nervous behavior before and during the stop, baggy clothing that obscured view of his waistband, and criminal history and prior gang membership—the approximately nine-minute detention before the vehicle search was not a "prolonged detention, *barely*." (Italics added.) The magistrate acknowledged "it is a close case."

The magistrate held Morfin to answer on all charges. Morfin pleaded not guilty.

## C. Renewed Suppression Motion and Motion to Dismiss

Morfin renewed his motion to suppress (Pen. Code,[6] § 1538.5, subd. (i)) and moved to dismiss his charges (§ 995) on the basis that the prosecution's only evidence against him was illegally obtained in violation of his Fourth Amendment rights. Morfin argued the magistrate erred in finding that the detention was not unduly prolonged. He reasoned that "any suspicion of officer safety was put at bay when they did the pat-down and . . . found nothing on him."

---

[5]  The magistrate acknowledged he was "not sure about National City and how tough an area that is."

[6]  Statutory references are to the Penal Code unless otherwise indicated.

8

The trial court confirmed that Morfin was basing his motion on the evidence admitted at the initial suppression hearing. So limited, the court clarified that its review of the magistrate's ruling was confined to ascertaining whether substantial evidence supported the magistrate's findings. After reviewing the preliminary hearing transcript and watching Officer Palma's body-worn camera footage, the court stated that it was "having a lot of problems with . . . whether or not there was substantial evidence to support the magistrate's conclusion in this case." The court asked the prosecutor "what authority [the police] had to put [Morfin] on the curb in handcuffs" after "they pulled him out and had the driver's license and patting him down." The prosecutor responded that Morfin's nervous conduct during each stage of the detention "confirm[ed] and further[ed] the reasonable suspicion the officer had that criminal activity was afoot."

After reiterating that its "only role" was determining "whether or not there was substantial evidence to support [the] magistrate's finding," and not to "independent[ly] review . . . whether . . . there was reasonable suspicion for the detention," the trial court concluded there was "evidence to support [the magistrate's] findings."

### D. Further Renewed Suppression Motion

A few months later, Morfin filed a renewed suppression motion, arguing that the trial court's earlier ruling addressed only Morfin's motion to dismiss and not his renewed suppression motion. The People essentially agreed. After hearing further argument, the trial court denied Morfin's renewed motion, finding that the court's "implied ruling from the original hearing that . . . the evidence relied on by the [magistrate] to determine that the [nine] minutes was not prolonged . . . is supported by the evidence."

9

**E. Change of Plea and Sentencing**

Morfin later pleaded guilty to all counts and admitted the prior allegations. The trial court dismissed the probation-denial priors. The trial court's indicated sentence was to refer Morfin to drug court and, if drug court did not accept him, then to impose but stay a one-year sentence pending completion of a residential drug treatment plan. Morfin's strike prior ultimately rendered him ineligible for drug court.

At the July 10, 2024 sentencing hearing, the trial court struck Morfin's strike prior, suspended imposition of sentence for two years, and placed Morfin on formal probation for two years subject to certain conditions, including that he serve one-year in custody, which the court suspended pending successful completion of probation and a residential treatment program.

## III. DISCUSSION

Morfin contends the trial court erred in denying his suppression motion because his detention was unduly prolonged. We agree.

**A. Standard of Review**

"Section 1538.5 affords criminal defendants a procedure by which they may seek suppression of illegally seized evidence. [Citation.] Our high court has said that section 1538.5 'provides a comprehensive and exclusive procedure for the final determination of search and seizure issues prior to trial.'" (*People v. Romeo* (2015) 240 Cal.App.4th 931, 940 (*Romeo*).) "[A] motion to suppress may be filed independently or at the preliminary hearing." (*Ibid.*)

10

"When a suppression motion is made before a magistrate in conjunction with a preliminary hearing, as in this case, the magistrate tries the facts, resolving credibility issues and conflicts in the evidence, weighing the evidence, and drawing appropriate inferences.  [Citations.]  If the magistrate denies the motion and holds the defendant to answer, the defendant must, as a prerequisite to appellate review, renew his challenge before the trial court by motion to dismiss under section 995 or in a special hearing.  [Citations.]  At that stage, the evidence is generally limited to the transcript of the preliminary hearing, testimony by witnesses who testified at the preliminary hearing (who may be recalled by the prosecution), and evidence that could not reasonably have been presented at the preliminary hearing."  (*Romeo, supra*, 240 Cal.App.4th at p. 941.)

"Where, as here, a suppression motion is made before a magistrate in conjunction with a preliminary hearing and no new evidence is presented in superior court, we are 'concerned solely with the findings of the [magistrate].' "  (*People v. Tacardon* (2022) 14 Cal.5th 235, 242; see *Romeo, supra*, 240 Cal.App.4th at p. 941.)  "After submission on the transcript at the special hearing, the appellate court, like the superior court, is bound by the magistrate's factual findings so long as they are supported by substantial evidence.  [Citations.]  On review of the superior court ruling by appeal or writ, a two-step standard of review applies.  In the first step of our review, 'we in effect disregard the ruling of the superior court and directly review the determination of the magistrate.'  [Citation.]  At this stage, we consider the record in the light most favorable to the People since 'all factual conflicts must be resolved in the manner most favorable to the [superior] court's disposition on the [suppression] motion.' "  (*Romeo*, at p. 941.)

11

In the second step, "[a]ccepting as established all implied or express factual findings by the magistrate as are supported by substantial evidence, we then proceed to measure those findings against Fourth Amendment standards articulated by the United States Supreme Court. [Citation.] At this stage, we independently apply the law to the factual findings [citations], determining de novo whether the factual record supports the magistrate's conclusion that the challenged search met the constitutional standard of reasonableness." (*Romeo, supra*, 240 Cal.App.4th at pp. 941–942; see *People v. Macabeo* (2016) 1 Cal.5th 1206, 1212 [" 'In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards.' "].)

## B. Fourth Amendment Principles

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." (U.S. Const., 4th Amend.; accord, Cal. Const., art. I, § 13.) "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." (*Heien v. North Carolina* (2014) 574 U.S. 54, 60.) "[B]ut 'where the police have probable cause to believe that a traffic violation has occurred,' the seizure is constitutionally reasonable." (*People v. Gyorgy* (2023) 93 Cal.App.5th 659, 669 (*Gyorgy*), quoting *Whren v. United States* (1996) 517 U.S. 806, 809–810.)

" 'A seizure for a traffic violation justifies' a ' "relatively brief encounter" ' for police investigation of the traffic violation. [Citation.] '[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the

12

stop [citation] and attend to related safety concerns [citation]. [Citations.] Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." [Citations]. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.' " (*Gyorgy, supra*, 93 Cal.App.5th at pp. 669–670, quoting *Rodriguez v. United States* (2015) 575 U.S. 348, 354 (*Rodriguez*).)

"The United States Supreme Court has identified tasks that are part of an officer's mission during a stop for a traffic violation: 'Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." [Citation.] Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.' " (*Gyorgy, supra*, 93 Cal.App.5th at p. 670, quoting *Rodriguez, supra*, 575 U.S. at p. 355.) A "temporary detention may sometimes also include . . . a criminal history check [citation], which is done by consulting an incar computer terminal or radioing dispatch." (*People v. Lopez* (2019) 8 Cal.5th 353, 363, fn. 4; see *Gyorgy*, at p. 670.) "These tasks are included within the officer's mission during a traffic stop because they 'serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.' " (*Gyorgy*, at p. 670, quoting *Rodriguez*, at p. 355.) "An officer may also require a lawfully stopped driver to exit the vehicle for officer safety to complete his traffic stop mission." (*Gyorgy*, at p. 670, citing *Rodriguez*, at p. 356.)

" 'On-scene investigation into other crimes, however, detours from [the traffic stop's] mission. [Citation.] So too do safety precautions taken in order to facilitate such detours.' " (*Gyorgy, supra*, 93 Cal.App.5th at p. 670, quoting

*Rodriguez, supra*, 575 U.S. at p. 356.)  Thus, "[w]hile '[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop,' the officer 'may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.' " (*Gyorgy*, at p. 670, quoting *Rodriguez*, at p. 355.)

"[A]n investigative stop can grow out of a traffic stop if the officer has reasonable suspicion of criminal activity to expand the investigation, even if those suspicions were unrelated to the underlying traffic offense." (*People v. Espino* (2016) 247 Cal.App.4th 746, 756–757.)  Therefore, "a stop may be prolonged 'if the prolongation itself is supported by independent reasonable suspicion.' " (*People v. Vera* (2018) 28 Cal.App.5th 1081, 1088 (*Vera*).)

## C.  Analysis

Morfin acknowledges that the initial traffic stop was lawful and that his pat-down was reasonable under the circumstances.  He maintains, however, that his continued detention after the pat-down revealed nothing and after his identity and parole status were confirmed was unreasonable.  We agree.

By about halfway through the approximately nine-minute detention, Officer Palma had obtained Morfin's driver's license and patted him down.  The pat-down revealed no contraband.  Still, Officer Palma kept Morfin handcuffed and seated on the curb for what the officer called a "field interview" and "investigation."  Officer Palma testified it normally takes him about two minutes to write a fix-it ticket for a broken taillight.  Had Officer Palma written the ticket at this stage of the detention, the detention would not have exceeded six or seven minutes.

14

Also around the seven-minute mark of the detention, the second officer appeared to confirm that Morfin's identification and parole status presented no problems. Yet, neither officer began writing a traffic citation. The detention would continue an additional two minutes longer as the officers continued to question Morfin about drugs and gangs.

Finally, around the nine-minute mark of the detention, Officer Palma looked inside Morfin's vehicle and saw contraband in plain sight.

Under the totality of circumstances, we conclude the detention was unjustifiably prolonged beyond the time reasonably needed to write Morfin a traffic ticket. (See *Rodriguez, supra*, 575 U.S. at p. 354 ["Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."].)

Nor was the prolonged detention independently justified by reasonable suspicion that Morfin was engaged in criminal activity apart from the broken taillight. (See *Vera, supra*, 28 Cal.App.5th at p. 1088 ["a stop may be prolonged 'if the prolongation itself is supported by independent reasonable suspicion' "].) The traffic stop occurred mid-morning in broad daylight. There was no evidence that it occurred in a high-crime area; indeed, the magistrate was "not sure about National City and how tough an area that is." And Morfin complied with all officer commands. (See, e.g., *People v. Flores* (2024) 15 Cal.5th 1032, 1038–1039, 1045–1046 [no reasonable suspicion where the defendant ducked behind a car to hide from police in a high-crime area at night]; *People v. Pantoja* (2022) 77 Cal.App.5th 483, 487, 490–491 [no reasonable suspicion for a pat-down where a " 'nervous' " but "cooperative" person with a history of weapons arrests was detained on vehicle infractions in a "high crime area" while wearing "baggy" clothing].)

The People maintain the detention was not unjustifiably prolonged because "the chronology of the events" shows that Officer Palma observed the contraband in plain view while he "was waiting for confirmation as to [Morfin's] probationary status." (See *Vera, supra*, 28 Cal.App.5th at p. 1088 [verifying identification and performing a warrant check are "within the mission" of a traffic stop].) In support, the People cite Officer Palma's preliminary hearing testimony that as of "the 4- or 5-minute mark" in the body-worn camera footage, Officer Palma was "still waiting to see if [Morfin] was on probation or if he was wanted for anything" else. But Officer Palma did not look inside Morfin's vehicle for another four or five minutes after that, and the officer testified he did not "recall if [he] had verified the probation" status with dispatch before looking in Morfin's vehicle. Moreover, the body-worn camera footage appears to show the second officer reporting around the seven-minute mark that dispatch confirmed that Morfin's records were valid. Another two minutes elapsed before Officer Palma looked inside Morfin's vehicle.

On this record, we conclude that although reasonable suspicion justified the initial traffic stop and removal of Morfin from his vehicle for a weapons pat-down, no reasonable suspicion justified prolonging the detention beyond the time necessary to write a traffic ticket so that the officers could further investigate Morfin for drug offenses unrelated to the mission of the traffic stop. (See *Rodriguez, supra*, 575 U.S. at p. 357 ["Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular."].)

## IV. DISPOSITION

The judgment is reversed.

16

RUBIN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.