Filed 07/14/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH GYORGY,<br><br>    Defendant and Appellant. | G061567<br><br>(Super. Ct. No. 18NF2747)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, H. Shaina Colover, Gary S. Paer, and Lance P. Jensen, Judges. Reversed and remanded.

Eric Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel, Seth M. Friedman and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

1

After the truck Joseph Gyorgy was driving was pulled over for making an unsafe lane change, a police officer used his narcotics detection dog to sniff the truck's exterior. The police dog alerted, signaling it detected the odor of narcotics inside the truck's cab. In a subsequent search of the truck, officers found methamphetamine, a pipe, a handgun, and ammunition.

In the trial court, Gyorgy twice moved to suppress the evidence seized in the search of his truck, arguing the search occurred during an unlawfully prolonged traffic stop in violation of the Fourth Amendment to the United States Constitution. The trial court denied his motions, and he was convicted of possession of methamphetamine and drug paraphernalia.

His sole argument on appeal is the trial court erred by denying his motions to suppress. Based on our application of the United States Supreme Court's decision in *Rodriguez v. United States* (2015) 575 U.S. 348 (*Rodriguez*), we agree the court erred. What began as a lawful traffic stop violated the Fourth Amendment's shield against unreasonable seizures when the officers detoured from the traffic stop's mission by conducting the dog sniff and inquiring into matters unrelated to the traffic violation and these detours prolonged the stop "'beyond the time reasonably required to complete the mission' of issuing a ticket for the [traffic] violation. [Citation.]" (*Rodriguez, supra*, 575 U.S. at pp. 350–351.) We also reject the Attorney General's alternative argument the stop was lawfully prolonged based on reasonable suspicion of other criminal activity. Accordingly, we reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

TRAFFIC STOP AND SEARCH RESULTING IN GYORGY'S ARREST[1]

About 12:45 in the afternoon on March 16, 2018, Officer Anthony McGlade of the Anaheim Police Department was on duty with his canine partner, Titan, a certified narcotics detection police dog. McGlade was contacted by an undercover officer regarding a black pickup truck that had been at the Tampico Motel; the undercover officer stated the "vehicle had acted suspiciously" but did not explain further. McGlade knew drug trafficking was a problem at this motel.

McGlade saw the truck driving down the avenue and pulled up behind it in his marked police car. As he started following the truck, the truck's turn signal illuminated for a couple of seconds before the truck abruptly moved to the adjacent lane, causing a vehicle traveling in that lane to brake "hard." McGlade deemed the truck's lane change to be unsafe, a violation of the Vehicle Code. (See Veh. Code, § 22107 ["No person shall turn a vehicle . . . or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal . . . in the event any other vehicle may be affected by the movement"].)

McGlade initiated a traffic stop of the truck, which immediately pulled over and stopped. McGlade activated his body video camera after the truck stopped.[2] He exited his police car and contacted the truck's driver, Gyorgy.

_____

[1] The following facts concerning the traffic stop and search that lead to Gyorgy's arrest are taken from the reporter's transcript of the preliminary hearing, which was held concurrently with the hearing on Gyorgy's motion to suppress.

[2] McGlade's body camera video is not part of the appellate record as it was not admitted into evidence during the suppression hearing. However, defense counsel used the video multiple times to refresh McGlade's recollection as to certain events during the traffic stop and their timing.

In the first minute of the traffic stop,[3] McGlade asked Gyorgy for his driver's license and inquired if the truck was his. Gyorgy provided his California driver's license to McGlade. Over the next few minutes, McGlade asked Gyorgy several questions, including whether Gyorgy was on probation or parole, whether he was a narcotics or sex registrant, whether he had any needles or sharp objects in the truck, and whether he had any weapons or drugs in the truck. Gyorgy responded he was a registered sex offender (Pen. Code, § 290) but denied everything else. When McGlade asked about prior arrests, Gyorgy mentioned two prior felony arrests; one was for a theft offense and both were nonviolent felonies.

After learning Gyorgy was a registered sex offender, McGlade questioned him as to whether he was current on his registration requirements. Gyorgy stated he was. McGlade continued with this line of inquiry, asking Gyorgy where he was registered and where he lived. Gyorgy provided a long explanation indicating the house where he had been living was sold after his mother passed away and he was having difficulties with his family and inheritance. Gyorgy informed McGlade he had been staying at local motels. McGlade inquired which hotels and after "some reminding," Gyorgy said he had been staying at the Tampico Motel. He stated he had been in Anaheim only for two nights.

At this point in the traffic stop (about four or five minutes in), McGlade ordered Gyorgy out of the truck so he could pat him down for weapons for officer safety purposes. Gyorgy got out of his truck and walked to the sidewalk with McGlade. When McGlade directed Gyorgy to sit on the curb, Gyorgy inquired if McGlade was going to pat him down. McGlade explained he could not do the patdown search until another officer arrived.

---

[3] For purposes of the traffic stop's timeline, we will use the time stamp on the video recording from McGlade's body camera, as referenced by the parties during the suppression hearing. We acknowledge, however, the traffic stop started before McGlade turned on his body video camera. (See *Arizona v. Johnson* (2009) 555 U.S. 323, 333 [traffic stop begins once the vehicle is pulled over].)

4

Gyorgy sat on the curb as directed by McGlade. When Gyorgy asked why he was pulled over and what was going on, McGlade responded, "I'll get to that. I'll tell you shortly" or something to that effect.

Officer John Pasqualucci arrived between the fifth and sixth minutes of the traffic stop. Prior to conducting the patdown search, McGlade explained to Gyorgy he was pulled over because he made an abrupt lane change and the vehicle behind him had to slam on its brakes. Gyorgy inquired why McGlade had him get out of the truck, and McGlade responded it was for officer safety. McGlade performed the patdown search on Gyorgy and found nothing illegal.

At this point in the traffic stop (about seven and one-half minutes in), McGlade told Gyorgy he was a K-9 handler and had the right to take his police dog around Gyorgy's truck. When Gyorgy refused to give him permission to search the truck's interior with the police dog, McGlade said something akin to: "[I]t really doesn't matter. You don't have to say yes or no. It really doesn't matter what you think. I have the right to be able to do this."

McGlade began preparations to have Titan sniff the exterior of Gyorgy's truck. Gyorgy had a small Maltese dog inside his truck. McGlade informed Gyorgy he was going to take Gyorgy's dog out of the truck's cab. Gyorgy said he did not want McGlade in the truck's cab and would take out his dog himself. McGlade walked Gyorgy from the curb to the truck and allowed Gyorgy to remove his dog through the half-open passenger side window. He then had Gyorgy return to and sit on the curb. McGlade opened the driver's door on Gyorgy's truck, turned the key to accessory mode, and rolled up the truck's windows, because the half-open window would be a safety hazard for Titan during the dog sniff. Gyorgy protested when McGlade entered the truck's cab, but McGlade told Gyorgy he had a right to go into the truck to roll up the windows.

5

McGlade retrieved Titan from his police car and had the dog sniff the truck's exterior. McGlade made several orbits around the truck with Titan. At 11 minutes and 54 seconds into the traffic stop, Titan alerted to an area underneath the truck's bed. Titan's alert indicated to McGlade Titan had detected the odor of narcotics and pinpointed the location of the odor. McGlade continued taking Titan around the truck's exterior. After Titan alerted by the bottom seam on the driver's door, McGlade let Titan into the truck's cab to search for narcotics. Titan showed an interest in bags on the truck's backseat but did not present a final alert, which indicated to McGlade Titan had detected the odor of narcotics but could not pinpoint the source of the odor.

McGlade returned Titan to his police car before he and Pasqualucci searched the truck's interior. In the search, they found methamphetamine and a glass pipe with white residue indicative of having been used to smoke methamphetamine. Inside a backpack that was inside a cardboard box, they found an unloaded handgun, an empty magazine, and six live rounds of ammunition. After finding the firearm, McGlade conducted a records check of Gyorgy's criminal history and learned he was prohibited from possessing the firearm because he had been convicted of a felony.[4] Gyorgy was arrested and charges were filed against him for unlawful possession of drugs, paraphernalia, a firearm, and ammunition.

## II.

### MOTIONS TO SUPPRESS

Prior to his preliminary hearing, Gyorgy moved under Penal Code section 1538.5 to suppress the evidence obtained during the search of his truck, arguing he was detained "in an unreasonable and prolonged manner" and the search and seizure of items from his truck was unreasonable. The People opposed the motion, asserting McGlade had reasonable suspicion to stop Gyorgy based on a Vehicle Code violation, Titan's alert

---

[4] Gyorgy was previously convicted of felony indecent exposure (Pen. Code, § 314), an offense requiring registration under section 290.

6

provided probable cause to search the truck, and the items found during the search provided probable cause for Gyorgy's arrest. The court heard the motion to suppress at the preliminary hearing, during which McGlade was the sole witness.[5]

A major focus during the hearing, after defense counsel informed the court he intended to rely on *Rodriguez, supra*, 575 U.S. 348 to support his prolonged stop argument, was what Pasqualucci was doing while McGlade was preparing for and executing the dog sniff of Gyorgy's truck. Initially, McGlade testified when he started the dog sniff around Gyorgy's truck, Pasqualucci "had not completed a citation." However, on cross-examination, McGlade admitted he did not know if Pasqualucci ever started writing a traffic citation. While their "common practice" was for one officer to start writing the traffic citation while the other officer conducted the dog sniff, McGlade had no knowledge whether Pasqualucci started writing the traffic citation while he was conducting the dog sniff with Titan. After being shown video from his body camera, McGlade acknowledged Pasqualucci did not take out a citation pad to write a traffic citation. And McGlade disclosed he never saw a fully or partially completed traffic citation in this case.

McGlade testified Pasqualucci's primary responsibility was to watch Gyorgy for officer safety purposes while McGlade was preparing for and performing the dog sniff with Titan. He agreed with defense counsel "it would be unusual" for a backup officer, whose primary focus is officer safety, to be distracted from that by writing a citation. McGlade again admitted he had no affirmative information Pasqualucci was writing a traffic citation.

A third officer arrived *after* Titan alerted during the dog sniff, but McGlade did not pass on to this officer any details for writing a traffic citation. McGlade

---

[5] At the beginning of the hearing, the parties stipulated there was no warrant.

7

explained it was unnecessary because "once [he] established probable cause for the [search of the] car, [he] no longer needed a traffic citation."

McGlade also testified that at the time Titan alerted during the dog sniff, he had not verified Gyorgy was in compliance with his Penal Code section 290 registration requirements. While Gyorgy had told McGlade he was in compliance with his registration requirements and was registered in San Bernardino County, he also said he had been staying at the Tampico Motel. McGlade testified he wanted to confirm Gyorgy's compliance with his registration requirements, but he did not testify he took any actions to do so.

The court (Judge Colover) denied the suppression motion, stating: "Based on the applicable law, all of the evidence and the facts, including the arguments of counsel, including the prolonged stop argument, as well as the other arguments made, based on the applicable law as well as the witness testimony, the Court respectfully denies the motion to suppress made pursuant to Penal Code section 1538.5."

Following the preliminary hearing, Gyorgy was charged with possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 1), possession of ammunition by a prohibited person (Pen. Code, § 30305, subd. (a)(1); count 2), misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 3), misdemeanor possession of controlled substance paraphernalia (Health & Saf. Code, § 11364, subd. (a); count 4), and making an unsafe vehicle turning movement (Veh. Code, § 22107; count 5).[6]

Subsequent to his arraignment, Gyorgy again moved to suppress the evidence seized during the search of his truck on the ground it was the unlawful product of a prolonged traffic stop. The People again opposed the motion. The motion was heard by a different judge (Judge Paer) and no new evidence was presented in support of the

---

[6] The bench trial on the traffic infraction charge of making an unsafe turning movement was bifurcated from the jury trial on the other charges.

8

motion. After reviewing the preliminary hearing transcript and considering the parties' arguments, the court denied the suppression motion. The court ruled: "In summary, we have a lawful traffic stop. We have a lawful detention. The detention was not prolonged. And the dog sniff created probable cause to search the vehicle for the drugs. I don't find any 4th Amendment violation."

III.

TRIAL PROCEEDINGS AND SENTENCING

Following a jury trial, Gyorgy was convicted of the misdemeanor charges of possession of methamphetamine and paraphernalia (counts 3 & 4).[7] The court declared a mistrial as to the charges of unlawful possession of a firearm and ammunition (counts 1 & 2) after the jury was unable to reach a verdict on those charges.

At the sentencing hearing for the misdemeanor convictions, the court suspended imposition of sentence and placed Gyorgy on informal probation with various terms and conditions. Gyorgy timely appealed.[8]

DISCUSSION

Gyorgy contends his rights under the Fourth Amendment to the United States Constitution were violated because McGlade unlawfully prolonged the traffic stop and the trial court erred by denying his motions to suppress.

---

[7] We do not discuss the evidence presented at trial as the sole issue on appeal concerns the denials of Gyorgy's motions to suppress and our review is limited to the evidence before the court when it ruled on those motions. (See *People v. Garry* (2007) 156 Cal.App.4th 1100, 1105, fn. 2.)

[8] Even though Gyorgy was convicted only of the misdemeanor offenses, appellate jurisdiction lies with this court because felony offenses were charged in the information and the case remains a "'felony case'" "regardless of the outcome." (Cal. Rules of Court, rule 8.304(a)(2); accord, *People v. Mazumder* (2019) 34 Cal.App.5th 732, 741, fn. 5.) Trials on the remaining charges were scheduled but had not yet been held at the time Gyorgy filed his notice of appeal in this matter.

9

I.

STANDARD OF REVIEW

"Where, as here, a suppression motion is made before a magistrate in conjunction with a preliminary hearing and no new evidence is presented in superior court, we are 'concerned solely with the findings of the [magistrate].' [Citation.] We defer to the magistrate's express and implied findings of fact if supported by substantial evidence. [Citations.] We independently assess whether the challenged search or seizure violates the Fourth Amendment, applying federal constitutional standards. [Citations.]" (*People v. Tacardon* (2022) 14 Cal.5th 235, 242.)

"'Although our review of factual determinations is deferential, it is not without limit. Factual determinations must be supported by substantial evidence.' [Citation.] To satisfy the substantial evidence standard, the evidence supporting the trial court's findings must be '"reasonable, credible, and of solid value."' [Citation.]" (*People v. Ayon* (2022) 80 Cal.App.5th 926, 937 (*Ayon*).)

II.

APPLICABLE LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." (U.S. Const., 4th Amend.; accord, Cal. Const., art. I, § 13.)[9] A traffic stop "constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment, but "where the police have probable cause to believe that a traffic violation has occurred," the seizure is constitutionally reasonable. (*Whren v. United States* (1996) 517 U.S. 806, 809–810.) Nevertheless, a traffic stop "that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the

---

[9] California applies federal constitutional standards to issues concerning the suppression of evidence obtained during a governmental search and seizure. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8.)

Constitution." (*Illinois v. Caballes* (2005) 543 U.S. 405, 407 (*Caballes*).) "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." (*Rodriguez, supra*, 575 U.S. at p. 350.)

"A seizure for a traffic violation justifies" a "'relatively brief encounter'" for police investigation of the traffic violation. (*Rodriguez, supra*, 575 U.S. at p. 354.) "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop [citation] and attend to related safety concerns [citation]. [Citations.] Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' [Citations]. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. [Citation.]" (*Ibid.*)

The United States Supreme Court has identified tasks that are part of an officer's mission during a stop for a traffic violation: "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' [Citation.] Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. [Citations.]" (*Rodriguez, supra*, 575 U.S. at p. 355.) The temporary detention may also include "a criminal history check [citation], which is done by consulting an incar computer terminal or radioing dispatch. [Citations.]" (*People v. Lopez* (2019) 8 Cal.5th 353, 363, fn. 4.) "'And although not specifically compelled by law, certain other steps customarily taken as matters of good police practice are no less intimately related to the citation process: for example, the officer will usually discuss the violation with the motorist and listen to any explanation the latter may wish to offer.'" (*People v. Tully* (2012) 54 Cal.4th 952, 981.) These tasks are included within the officer's mission during a traffic stop because they "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are

11

operated safely and responsibly. [Citations.]" (*Rodriguez, supra*, 575 U.S. at p. 355.) An officer may also require a lawfully stopped driver to exit the vehicle for officer safety to complete his traffic stop mission. (*Id.* at p. 356.)

"On-scene investigation into other crimes, however, detours from [the traffic stop's] mission. So too do safety precautions taken in order to facilitate such detours. [Citation.]" (*Rodriguez, supra*, 575 U.S. at p. 356.) While "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop," the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. [Citation.]" (*Id.* at p. 355.)

In *Rodriguez*, the United States Supreme Court explained when an officer uses a police dog to detect the presence of drugs (a dog sniff) during a stop that was based on a moving violation, the officer is detouring from the traffic stop's mission. (*Rodriguez, supra*, 575 U.S. at p. 356.) The dog sniff's purpose is not connected to roadway safety (*ibid*.) but to "'detect[ing] evidence of ordinary criminal wrongdoing.' [Citations.]" (*id.* at p. 355).

When an officer detours from the traffic stop's mission by conducting unrelated checks or having a police dog sniff the vehicle absent reasonable suspicion, the traffic stop "can become unlawful if it is prolonged [by these detours] beyond the time reasonably required to complete" the mission of issuing the traffic citation or warning. (*Caballes, supra*, 543 U.S. at p. 407; accord, *Arizona v. Johnson, supra*, 555 U.S. at p. 333 ["officer's inquiries into matters unrelated to the justification for the traffic stop" permitted "so long as those inquiries do not measurably extend the duration of the stop"].)

The police are not foreclosed from performing unrelated investigative efforts like dog sniffs during a traffic stop but must not prolong the detention when they do. In *Caballes*, the United States Supreme Court found no Fourth Amendment violation where one state trooper walked his narcotics detection dog around the defendant's car

12

while another trooper was in the process of writing the defendant a warning ticket for speeding. (*Caballes, supra*, 543 U.S. at pp. 406–408.) Similarly, in *People v. Vera* (2018) 28 Cal.App.5th 1081 (*Vera*), the Court of Appeal held a dog sniff did not unconstitutionally prolong the traffic stop where one officer used a police dog to sniff the defendant's vehicle while a second officer started writing the citation and the officer had not completed the citation when the dog alerted. (*Id.* at pp. 1084–1089.)

However, in *Rodriguez*, the United States Supreme Court found a dog sniff unlawfully prolonged a traffic stop where it was conducted after the officer had issued a written warning for the traffic violation. (*Rodriguez, supra*, 575 U.S. at pp. 352–357.) In *Rodriguez*, the Supreme Court explained: "[W]hether the dog sniff occurs before or after the officer issues a ticket" is not the deciding factor. (*Id.* at p. 357.) "The critical question . . . is . . . whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop,' [citation]." (*Ibid.*)

"This much . . . is clear" from United States Supreme Court precedent: "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." (*Florida v. Royer* (1983) 460 U.S. 491, 500 (plur. opn. of White, J.).) Because addressing the traffic infraction is the purpose of a traffic stop, it may "'last no longer than is necessary to effectuate th[at] purpose.'" (*Rodriguez, supra*, 575 U.S. at p. 354.)

III.

THE STOP WAS UNLAWFULLY PROLONGED

McGlade detoured from the traffic stop's mission almost immediately. McGlade testified he stopped Gyorgy for the traffic violation of making an unsafe lane change. His mission for issuing a ticket or warning for the suspected traffic violation included the tasks of determining whether Gyorgy had a valid driver's license, checking his vehicle registration and proof of insurance, ascertaining whether he had outstanding warrants, and potentially even running a criminal history check, before writing the

13

citation or issuing the warning. (*Rodriguez, supra*, 575 U.S. at p. 355; see also *People v. Lopez, supra*, 8 Cal.5th at p. 363, fn. 4; *People v. McGaughran* (1979) 25 Cal.3d 577, 584 (plur. opn.).) From our record, it appears McGlade performed none of these tasks. The record shows McGlade requested and obtained Gyorgy's driver's license, but the record does not show he verified its validity through a records check. While McGlade asked Gyorgy if the truck belonged to him, he did not request the truck's registration or insurance documentation. It was more than five minutes into the detention before McGlade explained to Gyorgy the basis for the traffic stop—an unsafe lane change. The record does not show McGlade did anything else to address the traffic violation.

McGlade inquired into matters unrelated to the suspected traffic violation, asking Gyorgy about his probation and parole status, his criminal background, the contents of his truck, and whether he was a narcotics or sex offender registrant. Upon learning Gyorgy was a registered sex offender, McGlade questioned him about where he was registered and whether he was current with his registration requirements. McGlade was permitted to detour from the traffic stop's mission and question Gyorgy about unrelated matters only so long as the questioning did not measurably prolong the stop beyond the time required to cite him. (*Rodriguez, supra*, 575 U.S. at p. 355; *Arizona v. Johnson, supra*, 555 U.S. at p. 333.)

After the patdown search revealed nothing and Gyorgy would not give McGlade permission to search his truck, McGlade told Gyorgy he was going to use his police dog to sniff the truck's exterior. This was about seven and one-half minutes into the traffic stop. The dog sniff and the "safety precautions" McGlade took to facilitate it were further detours from the traffic stop's mission. (*Rodriguez, supra*, 575 U.S. at p. 356.) The detours McGlade took at this point included talking to Gyorgy about the dog sniff, having him remove his small dog from the truck, rolling up the truck's windows, directing Gyorgy to sit on the curb, and taking Titan around the truck multiple times to sniff its exterior. McGlade's detours prolonged the traffic stop's duration

14

beyond the time necessary to effectuate the stop's purpose. Therefore, the stop was unreasonable under the Fourth Amendment. (*Rodriguez, supra*, 575 U.S. at pp. 354–355.)

The Attorney General asserts McGlade did not unlawfully prolong the traffic stop with the dog sniff and the safety precautions leading up to it because Pasqualucci "was conducting the traffic investigation" while McGlade was pursuing a drug investigation. The record does not support this assertion. Nothing in our record shows Pasqualucci undertook any actions to address the traffic infraction. Pasqualucci did not have out a citation book to write a traffic citation. And there is no evidence in our record he was verifying the validity of Gyorgy's driver's license, checking his vehicle registration and proof of insurance, or even running a warrant check on Gyorgy—traffic investigation tasks—while McGlade was preparing for and conducting the dog sniff with Titan.

In denying Gyorgy's motion to suppress, the magistrate made no express factual findings. The magistrate, therefore, did not expressly find Pasqualucci was conducting the traffic investigation while McGlade was performing unrelated investigations. Nor is there substantial evidence in the record to support such an implied finding. It is the absence of this evidence that makes this case distinguishable from *Vera, supra*, 28 Cal.App.5th 1081, a case upon which the Attorney General relies. In *Vera*, the Court of Appeal concluded the dog sniff did not extend the length of the defendant's detention because the second officer had started but not yet completed the citation when the dog sniff occurred and the mission of the traffic stop was therefore unfinished. (*Id.* at pp. 1088–1089.)

Here, the dog sniff and other detours did unlawfully prolong the traffic stop. McGlade could lawfully detain Gyorgy for a reasonable period of time to determine whether to issue a traffic citation for the unsafe lane change and to conduct the "'ordinary inquiries incident to [the traffic] stop.' [Citation.]" (*Rodriguez, supra*, 575

15

U.S. at p. 355.) McGlade obtained Gyorgy's driver's license at the beginning of the stop, but the record does not show he did anything after that to investigate the traffic infraction. Instead, he spent most of the 11 minutes, 54 seconds of the detention (prior to the dog alert) performing tasks unrelated to the traffic stop mission. Examining the totality of the circumstances, we conclude the police were not reasonably diligent in completing the traffic stop's mission. (*Id.* at p. 357.)

We find support for our conclusion in *Ayon, supra*, 80 Cal.App.5th 926. There, law enforcement officers stopped the defendant's car for a traffic violation. (*Id.* at p. 930.) An officer took the defendant's driver's license and vehicle registration and transmitted this information to a dispatcher. (*Ibid.*) About three and one-half minutes into the stop, the officers had the defendant get out of the car and one officer patted him down. (*Id.* at p. 932.) Around this time, the police radio reported "the 'returns' from [the defendant's] license, registration, and identifying information," indicating they were "'valid.'" (*Ibid.*) There was no evidence the dispatcher transmitted any information justifying further investigation. (*Id.* at p. 938.) An officer began talking to the defendant and explained the basis for the stop. The officer requested permission to search the defendant's car, but the defendant declined to consent to a search. (*Id.* at p. 932.) The officer then requested a "'narco dog'" be brought to the location. (*Ibid.*) A narcotics detection dog and its handler arrived at 12 minutes and 45 seconds into the stop, and about six minutes later, the K-9 handler informed the officer the dog had alerted to an area of the defendant's car. (*Id.* at p. 933.) At no point during the traffic stop did an officer begin to write a traffic citation. (*Id.* at p. 938.)

In *Ayon, supra*, 80 Cal.App.5th 926, the Court of Appeal held "the police failed to diligently address the traffic infractions during the stop." (*Id.* at p. 939.) The court noted that while the police "initially conducted the stop in standard fashion by taking [the defendant's] documents and requesting a records check over the police radio, . . . that portion of the investigation was completed within the first three and a half

16

minutes of the stop" and after that point, the officer did not do anything to investigate the traffic infractions. (*Ibid.*) The Court of Appeal concluded the police unlawfully prolonged the traffic stop with the dog sniff, which added six minutes to its length, and other inquiries into matters unrelated to the stop's justification. (*Id.* at pp. 936, 939–941.)

Here, McGlade did not even begin the traffic stop in "standard fashion" like the officers in *Ayon*. (*Ayon, supra*, 80 Cal.App.5th at p. 939.) Although he obtained Gyorgy's driver's license, he did not request any other documents (vehicle registration or proof of insurance) and there is no evidence he ran a records or warrant check on Gyorgy in the first twelve minutes of the stop. McGlade, like the officers in *Ayon*, unlawfully prolonged the stop by conducting the dog sniff and other unrelated inquiries.

IV.
### THE PROLONGED STOP WAS NOT OTHERWISE REASONABLE UNDER THE FOURTH AMENDMENT

The Attorney General alternatively asserts if the traffic stop was prolonged, it was nonetheless supported by reasonable suspicion of independent criminal activity. We disagree.

"If the police develop reasonable suspicion of some other criminal activity during a traffic stop of lawful duration, they may expand the scope of the detention to investigate that activity. [Citations.]" (*People v. Espino* (2016) 247 Cal.App.4th 746, 756.) This is permissible because a police officer possessing a "reasonable suspicion that a person may be involved in criminal activity" may briefly detain the person and "take additional steps to investigate further. [Citations.]" (*Hiibel v. Sixth Judicial Dist. Court* (2004) 542 U.S. 177, 185.)

"Reasonable suspicion is a lesser standard than probable cause and can arise from less reliable information than that required for probable cause. [Citation.]" (*People v. Espino, supra*, 247 Cal.App.4th at p. 757.) But a detaining officer must be able to "'point to specific articulable facts that, considered in light of the totality of the

17

circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' [Citation.]" (*In re Raymond C.* (2008) 45 Cal.4th 303, 307.) "'"[A]n investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith."'" [Citation.]" (*People v. Espino, supra*, 247 Cal.App.4th at p. 757.)

The Attorney General contends the prolongation of the traffic stop was justified because McGlade was aware of facts supporting a reasonable suspicion: (1) Gyorgy may not have been in compliance with his Penal Code section 290 registration requirements, and (2) he may have been "involved with drugs." We conclude otherwise.

Asserting McGlade had a reasonable suspicion Gyorgy was not in compliance with his registration requirements, the Attorney General relies on McGlade's testimony Gyorgy said he was registered in San Bernardino County but he had been staying at local motels, including the Tampico Motel, for the past couple nights. Even if we assume McGlade had a reasonable suspicion Gyorgy was not in compliance with his Penal Code section 290 registration requirements, an issue we need not resolve here, there is no evidence in our record McGlade was detaining Gyorgy to investigate this suspected criminal activity. McGlade testified at the time he conducted the dog sniff with Titan he had not determined whether Gyorgy was in compliance with his registration requirements. But he did not testify to any action he or any other officer took to investigate whether Gyorgy was current with his registration or whether he was out of compliance by staying at the Tampico Motel.

Even assuming McGlade's mission shifted from investigating a traffic violation to investigating Gyorgy's compliance with his sex offender registration requirements, there is no evidence in our record McGlade was pursuing this mission. Instead, McGlade used Titan to sniff Gyorgy's truck for drugs. This action was unrelated to any investigation of Gyorgy's registration status. "The scope of the detention must be

18

carefully tailored to its underlying justification." (*Florida v. Royer, supra*, 460 U.S. at p. 500.) Here it was not.

Gyorgy's detention was not made lawful by what McGlade could have done but elected not to do—investigate Gyorgy's registration compliance. "The reasonableness of a seizure . . . depends on what the police in fact do." (*Rodriguez, supra*, 575 U.S. at p. 357.) Thus, even if McGlade had a reasonable suspicion Gyorgy was not in compliance with his registration requirements, the seizure was not carefully tailored to an investigation of that suspected criminal activity and therefore was unreasonable.

As for a reasonable suspicion Gyorgy may be "involved with drugs," the Attorney General points to McGlade's testimony he received a call from an undercover officer to be on the lookout for Gyorgy's truck because it had been at the Tampico Motel, which was known for drug trafficking, and the undercover officer reported the "vehicle had acted suspiciously." These facts are insufficient to create a reasonable suspicion Gyorgy was "involved with drugs." Gyorgy's presence at the Tampico Motel, without more, did not raise a reasonable suspicion he was engaged in criminal activity. (See *Illinois v. Wardlow* (2000) 528 U.S. 119, 124 ["An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime"].) As there was no explanation as to how Gyorgy's "vehicle acted suspiciously," this does not constitute a specific articulable fact supporting a reasonable suspicion. Moreover, McGlade did not describe any behavior by Gyorgy during the traffic stop that suggested his involvement with drugs. No evidence was presented at the suppression hearing, for example, Gyorgy exhibited symptoms of being under the influence of narcotics or that McGlade learned from a records check Gyorgy had prior drug convictions. McGlade, therefore, had no factual basis for a reasonable suspicion, as opposed to a mere hunch or rumor, Gyorgy was engaged in criminal drug activity, and a hunch or speculation was an inadequate

19

basis to prolong his detention.  (See *People v. Wells* (2006) 38 Cal.4th 1078, 1083 ["'an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful'"].)

Because the prolonged stop was unreasonable within the meaning of the Fourth Amendment, the trial court erred by denying the motion to suppress.

DISPOSITION

The judgment is reversed, Gyorgy's convictions are vacated, and the matter is remanded.  On remand, the trial court shall vacate the order denying Gyorgy's motion to suppress the evidence seized in the vehicle search and the court shall enter a new order granting the motion.

MOTOIKE, J.

I CONCUR:

GOETHALS, J.

20

Moore, Acting P. J., Dissenting.

I respectfully dissent.

"The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated . . . ." (U.S. Const., 4th Amend., italics added.)  "Regrettably, traffic stops may be dangerous encounters."  (*Maryland v. Wilson* (1997) 519 U.S. 408, 413.)

The majority finds that Anaheim Police Officer Anthony McGlade did not begin a traffic stop in a "'standard fashion,'" that he allowed five minutes to pass before he "explained" to the driver "the basis for the traffic stop," that he "detoured from the stop's mission," and that McGlade "had not determined" if the driver was in violation of his legal duty to register as sex offender, before he conducted a dog sniff to determine whether the driver was transporting illegal narcotics.

Generally, I do not believe it is the role of judges to tell police officers how to do their jobs.  In a Penal Code section 1538.5 motion to suppress evidence, the function of the court is simply to decide whether the challenged search or seizure was "unreasonable" under the Fourth Amendment.  The narrow constitutional issue in this case is whether a 12-minute traffic stop (a seizure) was unreasonably long.[1]

Here, Officer McGlade was told by another officer that a black pickup truck had left "the Tampico Motel, which is a problem motel in the city of Anaheim for drug trafficking, and that this vehicle had acted suspiciously."  After McGlade got directly behind the truck, he saw the driver make an abrupt (possibly evasive) lane change, causing another vehicle to forcefully apply its brakes.

Officer McGlade made a traffic stop based on the suspected traffic violation (an unsafe turning movement or lane change).  During the stop, the driver, Joseph

---

[1] An exterior dog sniff of a vehicle is not a "search" within the meaning of the Fourth Amendment because it is not a governmental intrusion into an area where a person has a reasonable expectation of privacy.  (*Illinois v. Caballes* (2005) 543 U.S. 405, 409.)

1

Gyorgy, told McGlade he had prior felony arrests, and he was a registered sex offender, purportedly registered in neighboring San Bernardino County.  McGlade asked Gyorgy where he was living.  Gyorgy initially said he was "living out east somewhere in the desert."  Gyorgy then related a "lengthy" story about the house where he used to live, about it being sold because his mother had passed away, and issues having to do with his family and an inheritance.  Gyorgy said he was staying locally in different motels, then he finally said, "he was living at the Tampico or staying at the Tampico Motel."

An officer may temporarily detain (seize) a person without a warrant when there is a reasonable suspicion of criminal activity.  (*Terry v. Ohio* (1968) 392 U.S. 1, 10, 23 (*Terry*) ["It would have been poor police work indeed for an officer . . . to have failed to investigate this behavior further"]; *Illinois v. Wardlow* (2000) 528 U.S. 119, 124 ["nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"].)  Under the Fourth Amendment, "the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account."  (*U.S. v. Cortez* (1981) 449 U.S. 411, 417.)  The officer may also conduct a patdown search if there is a reasonable suspicion the person may be armed and dangerous.  (*Terry*, at p. 23.)

The totality of the circumstances in this case included:  Officer McGlade's knowledge of drug trafficking at the Tampico Motel; the information from an undercover police officer that a black pickup truck had been acting suspiciously and had just left the Tampico Motel; the seemingly evasive and illegal driving maneuver by the pickup truck when McGlade positioned his marked police vehicle directly behind the truck; the information from Gyorgy that he had prior felony arrests; the information from Gyorgy that he was a registered sex offender, purportedly registered in a neighboring county; McGlade's knowledge that a registered sex offender ordinarily has an obligation to register with the local police department within five days of moving into a different county from where they are currently registered (see Pen. Code, § 290 et seq.); and Gyorgy's convoluted answer in response to McGlade's direct question about where he

2

was currently living. Under any reasonable interpretation of the developing facts, this was no longer a routine traffic stop restricted by the time necessary for McGlade to write a traffic ticket. (Compare *Rodriguez v. United States* (2015) 575 U.S. 348, 350–351.)

Given the totality of the circumstances—the whole picture—Officer McGlade articulated facts supporting a reasonable suspicion of *at least three* possible law violations within moments of pulling over the truck: 1) Gyorgy had possibly violated the Vehicle Code (the traffic violation); *and* 2) Gyorgy had possibly violated the Health and Safety Code (transporting illegal drugs); *and* 3) Gyorgy had possibly violated the Penal Code (failing to keep current with his sex offender registration requirements).

When asked for facts supporting a reasonable suspicion Gyorgy may have been armed and dangerous, McGlade testified: "The fact that he's leaving a known drug trafficking motel, which based on my training and experience, I know that narcotics traffickers often possess weapons to do their narcotics business. [W]hen I pulled behind him, I would describe he conducted an abrupt maneuver to avoid being contacted by the police and moving out of the way. And now as I speak to him, he's telling me that he's not only been arrested for felonies in the past, that he's also a sex registrant, which, once again, I know they can be violent and dangerous people."

Officer McGlade was reasonably justified in conducting a patdown search, and in waiting to have a backup officer present for this procedure for officer safety reasons. (*City & County of San Francisco v. Sheehan* (2015) 575 U.S. 600, 615 ["Courts must not judge officers with '"the 20/20 vision of hindsight"'"].)

Also, I am aware of nothing in the Constitution that prevents a police officer from investigating a suspect's possible crimes in the order the officer deems safe and appropriate, so long as the length of the detention is not "unreasonable" under the Fourth Amendment. (See, e.g., *United States et al. v. Texas et al.* (599 U.S. ___ (June 23, 2023, No. 22-58) 2023 WL 4139000, at p. *5 ["The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States"].)

3

Officer McGlade concluded the patdown search about seven minutes after he first pulled over Gyorgy. About five minutes later, the trained narcotics dog, Titan, alerted to the presence of illegal drugs in Gyorgy's pickup truck.[2] As two superior court judges found, I would hold this 12-minute traffic stop (a seizure) was not unreasonably long under the Fourth Amendment.

Indeed, some of this 12-minute seizure was due to Gyorgy's verbosity, as well as the time it took to allow Gyorgy to remove his small dog from the truck when he objected to Officer McGlade doing so. Finally, there was nothing in the law prohibiting McGlade from conducting the exterior dog sniff of the truck before making inquiries to confirm Gyorgy's purported compliance with his sex offender registration obligations.

Thus, I would affirm the judgment.


MOORE, ACTING P. J.

---

[2] Once the trained narcotics dog Titan alerted to the presence of illegal drugs in Gyorgy's pickup truck, Officer McGlade then had probable cause to search the vehicle. (See *People v. Stillwell* (2011) 197 Cal.App.4th 996, 1005–1007.)

4