Filed 11/9/23  P. v. Lee CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|   |   |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  CHARLES DAVID LEE,  Defendant and Appellant. | E079729  (Super.Ct.No. FWV22001531)  OPINION |

APPEAL from the Superior Court of San Bernardino County.  Mary E. Fuller, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Charles David Lee raises two suppression issues following his conviction of possession of ingredients with the intent to make an explosive device. First, he argues that evidence obtained following his traffic stop must be suppressed because the officer did not have probable cause to stop him, the officers unreasonably prolonged the stop to allow a narcotics-certified dog to examine the vehicle, and the dog's alert did not provide probable cause to search the vehicle because it may have responded to the scent of marijuana, which is now legal. Second, he argues that statements he made during a later residential search should not have been admitted at trial because officers did not give him a *Miranda* warning before questioning him. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) We find the contentions meritless and affirm.

## I. BACKGROUND

On May 2, 2022, Chino Police Officer Brendan Rowland pulled Lee's vehicle over for having a tinted license plate cover. After Rowland approached Lee in his car, Lee admitted he did not have a valid driver's license. Rowland returned to his car to wait for backup and to check whether Lee's license had been suspended.

Officer Nguyen arrived around the time Rowland determined Lee's license had been suspended. They asked Lee to exit his car and had him sit on the front bumper of Rowland's car. Rowland patted Lee down and found two pocketknives in Lee's pockets. Nguyen began writing a citation for having a tinted plate cover and driving with a suspended license. Rowland asked Lee for consent to search the car, and Lee refused.

2

Although the record is unclear on when it occurred, it appears that at around the time Rowland asked for consent for the search, Lee indicated that there might be marijuana in the car.

While Nguyen was still writing the citation, Rowland removed his narcotics-certified dog from his vehicle and had the dog examine Lee's car. The dog was trained to alert on methamphetamine, ecstasy, heroin, cocaine, and marijuana. The dog alerted while Nguyen was still writing the citation. Rowland then searched Lee's car. After finding a substance he believed was methamphetamine, Rowland handcuffed Lee and placed him in the back of Nguyen's car before continuing the vehicle search, which turned up "drug paraphernalia," a collapsible baton, a BB gun, and multiple knives.[1]

Nguyen searched Lee and found a notebook in Lee's pocket. Rowland saw notes relating to substances and chemicals, so he took photographs of various pages and sent them to Detective Matthew Johnson, a SWAT team member with training in explosives, for further investigation. When he saw the notebook pages, Johnson grew concerned because some of the notebook entries were recipes for explosives.

The next day, Johnson and other officers executed a search warrant on a storage unit (Unit 102) belonging to Lee at a facility in Claremont. Among the items they found were glycerine, muriatic acid, sodium hydroxide, drain cleaner, sulfur powder, aluminum

---

[1] The record does not show whether the suspected methamphetamine was actually methamphetamine or another substance.

3

oxide, bleach, potassium permanganate, fireworks, a 5 pound container of potassium nitrate, a glass beaker, and a sifter.

That night, Johnson and other officers executed a search warrant at Lee's mother's apartment. While the search was underway, Johnson spoke with Lee outside the apartment. Johnson patted Lee down and removed a knife from Lee's pocket. While Lee's hands were behind his back, Johnson then guided Lee toward the stairs outside and suggested he sit down. As Johnson later recalled, "[t]here were some officers standing maybe 20, 30 feet away, and there was one additional officer that was closer to us." Johnson did not tell Lee then that he was under arrest.

Johnson began questioning Lee by asking him about the notebook. Lee mentioned that potassium permanganate could be used to start fires and explosions. He also acknowledged buying sulfur and potassium nitrate. He said he stored items at a storage unit in Pomona, but when Johnson then mentioned that he executed a search warrant for Lee's storage unit in Claremont, Lee acknowledged having a unit there. He said he had an interest in "doomsday prepping things" and acknowledged that the unit contained fireworks and potassium permanganate. At the end of the questioning, which lasted about an hour, Johnson told Lee that he would have to put him under arrest.

Lee was charged with one count of possessing materials with the intent to make an explosive or destructive device (Pen. Code, § 18720). When asked at trial about the significance of finding the recovered chemicals, Johnson said, "When these chemicals are put together in the same spot . . . they are able to be used to create an explosive,

4

especially when you have these different chemicals that are all for similar purposes in creating explosives, especially when you look at the notebook which has recipes, explosive recipes which include some of these ingredients."

Lee testified in his own defense. He admitted having the items that were found during the search of the storage unit but said they were for benign purposes. For instance, he said that he had sulfur powder for gardening, potassium nitrate as a food preservative, aluminum oxide as a non-slip paint additive, and potassium permanganate for use as both a "water purifier" and an "emergency fire, if you need to start a fire."

Lee repeatedly said he kept recipes of dangerous substances so that he knew what to avoid. When first asked about the recipes, Lee testified: "Well, why, well, I keep notes. Because I have some chemicals. All right. And I can't store them safely unless I know everything about them." Later, he said he wrote down the recipe for potassium permanganate flash powder as a precaution: "Yeah, so I know if I have chemicals, I can make this myself, something bad might happen. So don't store those chemicals together." At another point, he explained: "Because there is too much stuff on Google about interaction of chemicals. So I am like, I need to know the bad stuff, so I know what not to do. You know, so because there is too much information. This plus this . . . reacts this way. I wanted the harmful stuff. In order to not have that harmful stuff, I have to know what that harmful stuff is to not do it, kind of like reverse engineering." Still later, the following exchange occurred:

"Q. Okay. So start at the top. It says nitrate glycerine with a mixture of. What does that say, sir? Nitric sulfuric acid.

"A. Yeah.

"Q. What does that do?

"A. You got me. I don't know. Something harmful though.

"Q. Something horrible?

"A. Something harmful.

"Q. Oh, harmful, okay.

"A. Yeah.

"Q. So but you put that up there as a warning of what not to mix together?

"A. Correct.

"Q. Okay. So if it does something harmful, then how would it help you survive if it is the end of the world?

"A. Well, if something harmful, if there was a landslide, I need to make escape for my life, I can do something with that. I'm not sure. That is just stuff that can react badly next to each other."

After the jury found Lee guilty, the trial court sentenced Lee to three years in prison.

## II. DISCUSSION

### A. *Traffic Stop Search*

Before trial, Lee moved to suppress evidence from the search of the storage unit, items found during the car search, and the notebook found in his possession. After an evidentiary hearing, the trial court denied the motion.

"In ruling on a motion to suppress, the trial court finds the historical facts, then determines whether the applicable rule of law has been violated. 'We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review.'" (*People v. Hernandez* (2008) 45 Cal.4th 295, 298-299.)

Lee argues the evidence should have been suppressed because there was no reasonable suspicion for the traffic stop, the dog sniff search impermissibly prolonged the search, and the dog's alert did not give probable cause to search the vehicle because marijuana is legal under some circumstances. We address each in turn.

### 1. *Reasonable Suspicion for Traffic Stop*

First, Lee contends that there was no reasonable suspicion for the traffic stop.

"The Fourth Amendment protects against unreasonable searches and seizures. (U.S. Const., 4th Amend.; *Terry v. Ohio* (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.) 'A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the

7

circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' [Citation.] Ordinary traffic stops are treated as investigatory detentions for which the officer must be able to articulate specific facts justifying the suspicion that a crime is being committed." (*People v. Hernandez*, *supra*, 45 Cal.4th at p. 299; see also *People v. Wells* (2006) 38 Cal.4th 1078, 1082 ["Under the cases, an officer may stop and detain a motorist on reasonable suspicion that the driver has violated the law."].)

At the evidentiary hearing, Rowland testified that he pulled Lee over because his "license plate was obstructed by a slightly tinted plastic obstruction."

Vehicle Code section 5201, subdivision (c) provides that "[a] covering shall not be used on license plates." There are two exceptions, but neither applies here. The first exception allows covers "over a lawfully parked vehicle to protect it from the weather." (Veh. Code, § 5201, subd. (c)(1).) It does not apply because Lee was driving his car when Rowland began the stop. The second exception allows security covers "directly over the top of the registration tabs," and specifies that "[n]o portion of a license plate security cover shall rest over the license plate number." (*Id.* at § 5201, subd. (c)(2).) This exception does not apply because Lee's cover rested over the entire license plate.

Citing no case authority, Lee argues that Rowland lacked reasonable suspicion because there was "[n]o evidence the covering actually obstructed the reading of the numbers on the license plate." However, nothing in Vehicle Code section 5201, subdivision (c) requires that a license plate cover obstruct the license plate number.

8

Additionally, the commercial availability of products designed to thwart red light cameras provides a potential rationale for the provision's broad terms, as such products do not necessarily aim to obscure what a person (as opposed to a camera) could read. Because the cover extended over the entire plate, not just "over the top of the registration tabs" (*ibid.*), it violated the Vehicle Code, so Rowland had reasonable suspicion to initiate Lee's traffic stop.

## 2. *Dog Sniff*

Lee next argues that the dog sniff unconstitutionally prolonged the traffic stop. This court addressed the law surrounding dog sniffs in *People v. Vera* (2018) 28 Cal.App.5th 1081 (*Vera*):

"During the execution of a lawful traffic stop, the police may have a trained dog sniff the driver's vehicle, typically to detect the presence of drugs. Even if they lack any reason to believe that the dog will alert, police officers may conduct a dog sniff without implicating the Fourth Amendment, because a dog sniff is not a search at all. [Citations.]

"However, the Fourth Amendment nevertheless provides a limitation on a dog sniff performed in conjunction with a traffic stop. A detention that is justified solely by the governmental interest in issuing a traffic ticket to the driver 'can become unlawful if it is prolonged' by the dog sniff 'beyond the time reasonably required' to complete the mission of the traffic stop. [Citation.]

"In [*Rodriguez v. United States* (2015) 575 U.S. 348 (*Rodriguez*)], the United States Supreme Court addressed a case where a dog sniff prolonged a lawful traffic stop

9

by seven to eight minutes beyond the point at which the stop otherwise was complete. A police officer observed a vehicle being driven for one or two seconds onto the shoulder of a highway, in violation of state law. After stopping the vehicle for that traffic infraction, the officer questioned the driver about the incident; gathered his driver's license, registration, and proof of insurance; ran a records check; and then returned all the documents to the driver with a written warning. After that point, a second officer arrived with a trained dog that sniffed the vehicle, alerting to drugs seven or eight minutes after the warning was issued.

"On these facts, the federal court of appeals held that the extension of the stop was 'de minimis' and thus did not violate the Fourth Amendment. The Supreme Court, however, reversed, holding 'that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.' (*Rodriguez*, *supra*, 135 S.Ct. at p. 1614.) The Court allowed no 'de minimis' exception. (*Id.* at pp. 1615-1616.)

"Central to the Court's analysis was its explanation of the '"mission"' of a traffic stop, which is 'to address the traffic violation that warranted the stop . . . and attend to related safety concerns.' (*Rodriguez*, *supra*, 135 S.Ct. at p. 1614.) The mission includes 'determining whether to issue a traffic ticket' and '"ordinary inquiries incident to [the] stop."' (*Id.* at p. 1615, quoting [*Illinois v. Caballes* (2005) 543 U.S. 405, 408].) These 'inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and

10

proof of insurance.' (*Rodriguez*, *supra*, at p. 1615.)  The mission involves activities that serve the purpose of 'enforcement of the traffic code' (*id.* at p. 1615) and the 'safety precautions' that officers may need to take while doing so (*id.* at p. 1616).

"A dog sniff is outside the mission of the traffic stop because it is a measure 'aimed at "detect[ing] evidence of ordinary criminal wrongdoing."'  (*Rodriguez*, *supra*, 135 S.Ct. at p. 1615, quoting *City of Indianapolis v. Edmond* (2000) 531 U.S. 32, 40-41, 148 L.Ed.2d 333, 121 S.Ct. 447.)  A dog sniff 'is not fairly categorized as part of the officer's traffic mission.'  (*Rodriguez*, *supra*, at p. 1615.)  'Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.'  (*Id.* at p. 1616.)

"Because a traffic stop may '"last no longer than is necessary to effectuate"' the mission, '[a]uthority for the seizure thus ends' when the mission is completed 'or reasonably should have been' completed.  (*Rodriguez*, *supra*, at p. 1615.)  It follows that a seizure of a driver is '"unlawful"' when a suspicionless dog sniff prolongs the detention '"beyond" that point.'  (*Id.* at p. 1616.)

"The court stated that the permissible duration of the stop is not to be measured by the reasonable duration of traffic stops in similar circumstances, but by the amount of time actually necessary to perform the stop expediently.  (*Rodriguez*, *supra*, 135 S.Ct. at p. 1616.)  A police officer does not earn 'bonus time to pursue an unrelated criminal investigation' by proceeding rapidly.  (*Ibid.*)  'If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete

11

[the stop's] mission.'" (*Ibid.*) Thus, the "critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff "prolongs"—i.e., adds time to—"the stop," [citation].' (*Ibid.*, italics omitted.)." (*Vera*, *supra*, 28 Cal.App.5th at pp. 1085-1087.)

Here, the record gives us no reason to conclude that the dog sniff unconstitutionally prolonged Lee's detention.[2] First, soon after Rowland stopped Lee's vehicle and began questioning him, Lee said that he did not have a valid license. Rowland returned to his car to verify the information, when Nguyen arrived. This period fell within the traffic stop's mission, as *Rodriguez* states that "checking the driver's license" is an "'ordinary inquir[y] incident to [the] stop.'" (*Rodriguez*, *supra*, 575 U.S. at p. 355.) Even if Lee's statement that he did not have a valid license arguably ended the inquiry, Rowland did not unduly prolong the stop by taking the time needed to verify its veracity. (See *Vera*, *supra*, 28 Cal.App.5th at p. 1088 ["a stop may be prolonged 'if the prolongation itself is supported by independent reasonable suspicion'"].) Accordingly, Lee's argument that "Rowland detoured from the traffic stop's mission almost immediately" fails to show any constitutional violation.

Second, the period between when Nguyen arrived and when he started writing the ticket was within the traffic stop's mission. Rowland testified that once Nguyen arrived, they had Lee exit the vehicle, and Rowland performed a pat-down search on Lee.

---

[2] The record does not contain video footage of the traffic stop, so the evidence of the events comes entirely from Rowland's testimony.

12

Rowland then had Lee sit on the front bumper of Rowland's vehicle while Nguyen began writing the citation. These actions were reasonable, minimally invasive safety precautions by Rowland and Nguyen. (See *Vera*, *supra*, 28 Cal.App.5th at pp. 1086-187 ["The mission involves activities that serve the purpose of 'enforcement of the traffic code' [citation] and the 'safety precautions' that officers may need to take while doing so [citation]"].)

Third, Rowland testified that he unsuccessfully asked for consent to search Lee's vehicle, retrieved his dog, and performed the dog sniff all before Nguyen finished writing the citation. When asked during the hearing whether the dog "completed a sniff search before [Lee's] ticket had been completed," Rowland answered yes. Citing no authority, Lee argues that the dog sniff was not necessary to serve the mission of the traffic stop. This argument misconstrues the case law. Nothing in *Vera* or *Rodriguez* indicates that a dog sniff unrelated to the traffic violation can never take place. Rather, the rule is that the dog sniff may not unconstitutionally prolong the traffic stop. (*Rodriguez*, *supra*, 575 U.S. at p. 355 ["An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."]; see also *People v. Gyorgy* (2023) 93 Cal.App.5th 659, 672 [the officer "was permitted to detour from the traffic stop's mission and question Gyorgy about unrelated matters only so long as the questioning did not measurably prolong the stop beyond the time required to cite him"].)

13

Although "[i]t does not necessarily end the inquiry that the dog alerted before the citation was issued" (*Vera*, *supra*, 28 Cal.App.5th at p. 1089), Lee has made no showing that writing the citation took unusually long. He has not shown how long it took for the dog to alert, how long it usually takes Nguyen to write a citation, or whether Nguyen took more time than usual to write Lee's citation. (See *ibid.*) We therefore have no basis to conclude that the dog alerted after the citation reasonably should have been issued.

### 3. *Possible Alert for Marijuana*

Lee argues that, because marijuana possession can sometimes be legal, the dog alert could not have provided probable cause that the car contained contraband.

We begin by noting that Rowland's dog was trained to alert on methamphetamine, ecstasy, heroin, cocaine, and marijuana, and there is no evidence that the dog specifically alerted on marijuana. Rowland did not specify what substance triggered the alert. He said he cannot tell whether the dog alerts differently for one substance compared to another. Rowland also said that he found "drug paraphernalia"—a generic term that may or may not have indicated the presence of marijuana—and no marijuana turned up in the search. The only evidence in the record indicating there *may* have been marijuana in the car was Rowland's recollection that while Rowland asked Lee for consent to search the car, Lee said he might have marijuana in there. Because Rowland also said he found a substance he believed to be methamphetamine, Lee's claim that the dog "supposedly alerted to the possible odor of marijuana"—which is unsupported by any citation to the record, is weak at best.

14

However, Lee's argument fails whether the dog alerted specifically on marijuana. Even after the 2016 enactment of Proposition 64, which legalized the possession of up to 28.5 grams of marijuana by individuals 21 or older, "[i]t remains unlawful to possess, transport, or give away marijuana in excess of the statutorily permitted limits, to cultivate cannabis plants in excess of statutory limits and in violation of local ordinances, to engage in unlicensed 'commercial cannabis activity,' and to possess, smoke or ingest cannabis in various designated places, including in a motor vehicle while driving." (*People v. Fews* (2018) 27 Cal.App.5th 553, 561.) Although Lee might have had a legal amount of marijuana in a closed container in his vehicle (see Health & Saf. Code, §§ 11362.1, subd. (a)(1), 11362.3, subds. (a)(4), (a)(7)), given the possibility that the dog either alerted for one or more of the other substances it was trained on (methamphetamine, ecstasy, heroin, and cocaine) or alerted for an unlawful amount of marijuana, the alert here gave Rowland probable cause to search Lee's vehicle. (See *Florida v. Harris* (2013) 568 U.S. 237, 244 ["All we have required [for probable cause] is the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act'"].)

Moreover, Lee could have introduced evidence to undermine the reliability of the alert here, but he did not. "A defendant . . . must have an opportunity to challenge . . . evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards

15

are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field . . . may sometimes be relevant . . . . [Citation.] And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." (*Florida v. Harris*, *supra*, 568 U.S. at p. 247.) Other than Lee's cross-examination of Rowland during the evidentiary hearing, he has not sought to introduce any evidence about why this alert may have been unreliable, and he did not make any argument about the unreliability of this particular alert at the evidentiary hearing.

Lee relies on *People v. Lee* (2019) 40 Cal.App.5th 853, *People v. Shumake* (2019) 45 Cal.App.5th Supp. 1, and *People v. Johnson* (2020) 50 Cal.App.5th 620, which involved warrantless vehicle searches and marijuana, but none of these cases address an alert from a dog sniff. In *Lee*, the court found a small and legal amount of marijuana on the driver to be an insufficient basis for an inference that his car contained contraband. (*People v. Lee*, at p. 866.) Similarly, in *Shumake*, the court held a driver's admission that he had some marijuana in his car, though it may have justified further inquiry, did not provide probable cause to search the vehicle. (*People v. Shumake*, at p. 8.) And in *Johnson*, the court held the smell of marijuana did not on its own justify searching a vehicle for an open container of contraband. (*People v. Johnson*, at p. 634-635.) Whether probable cause exists depends on the "totality of the circumstances." (*Florida v.*

16

*Harris*, *supra*, 568 U.S. at p. 244.)  We therefore do not find these cases persuasive for the point that a dog sniff alert which may have been triggered by a variety of other narcotics made the search unreasonable.  On our facts, we conclude that Rowland had probable cause to search Lee's vehicle.

B. *Lee's Statements During the Apartment Search*

Lee argues his statements to Johnson during the search of his mother's apartment, which were not preceded by a *Miranda* warning, should not have been admitted at trial because Johnson's questioning constituted a custodial interrogation.  At a hearing held outside the presence of the jury, the trial court concluded the interview was not a custodial interrogation.

"'"[B]efore being subjected to 'custodial interrogation,' a suspect 'must be warned he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'"'  [Citation.]  Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact.  [Citation.]  'When reviewing a trial court's determination that a defendant did not undergo custodial interrogation,' an appellate court accepts the trial court's findings of historical fact if supported by substantial evidence, but independently determines 'whether, given those circumstances,' the interrogation was custodial."  (*People v. Kopatz* (2015) 61 Cal.4th 62, 80.)  Admission of statements obtained in violation of *Miranda* constitutes reversible error unless the admission was

17

harmless beyond a reasonable doubt.  (*People v. Moore* (2011) 51 Cal.4th 1104, 1129; *People v. Cunningham* (2001) 25 Cal.4th 926, 994.)

"An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'  [Citation.]  The test for *Miranda* custody is, '"would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."'"  (*People v. Kopatz*, *supra*, 61 Cal.4th at p. 80.)  "California courts have identified a number of factors relevant to this determination.  While no one factor is conclusive, relevant factors include:  '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.'"  (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 35-36.)  "Additional factors include:  '[W]hether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were "aggressive, confrontational, and/or accusatory," whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview.'"  (*Ibid.*)

Some factors suggest that there was a custodial interrogation here.  Some other officers accompanied Johnson to the scene.  On his bodycam video, he tells Lee's mother that four officers were there, though it is unclear whether they were present during the

18

interview. Lee was never told he could terminate the questioning, and he was arrested at the end of the interview.

On balance, however, we find that Johnson's questioning was not a custodial interrogation. Lee had not been formally arrested, and the questioning took place on a set of stairs outside his mother's apartment. "This is a significant difference from interrogation at the police station, 'which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.'" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1404, citing *Berkemer v. McCarty* (1984) 468 U.S. 420, 438.) Lee sat, unrestricted, throughout the questioning, at one point standing up and moving out of the way to let other people go down the stairs. The interview, which took about 40 to 45 minutes, was not a length that most courts have found to support a finding of custodial interrogation. (See *Green v. Superior Court* (1985) 40 Cal.3d 126, 134-135 [two hour interview was not custodial interrogation]; *People v. Moore* (2011) 51 Cal.4th 386 [one hour and 45 minute interview was not custodial interrogation]; see also *United States v. Bassignani* (9th Cir. 2009) 575 F.3d 879, 886 ["We have found a defendant not in custody when he was interrogated for 'more than one hour,' [citation], and 'approximately 45 minutes.' [Citation.] In contrast, we have found a defendant in custody when she was interrogated for 45 to 90 minutes."].) During the interview, Johnson gave Lee his number in case Lee had questions later on.

Perhaps most significantly, Johnson's demeanor during the interview was far from aggressive or accusatory. Less than a minute after Johnson had approached Lee, Lee commented that Johnson used "polite words." Soon after, Johnson denied Lee's request to continue the interview inside the apartment, and Johnson stated, "there's so many guns and knives in there. . . . I wanna make sure everyone's safe. Last thing I want to do is have things get out of hand. Obviously you've been very, uh, respectful so far and I appreciate that. Hopefully you feel like I've been respectful back to you." Lee responded: "Yeah, you are." We have reviewed the video recording and conclude Lee made these comments sincerely, not sarcastically. Moreover, after Lee revealed to Johnson that he was struggling with depression and drug abuse, Johnson spent several minutes giving advice and help to Lee. For instance, Johnson said, "Please don't tell me you're using heroin on top of using methadone," and when Lee replied "once in a while," Johnson replied, "it's dangerous stuff, like seriously dangerous stuff," adding, "please be careful." When housing came up, Johnson told Lee about social workers who could help find housing and recommended that Lee contact them. Johnson then said, "I just want to give you some information, just to help out, okay?" before detailing another resource for Lee to seek out. That Johnson was polite and courteous instead of aggressive and accusatory is "highly significant." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1164.) We therefore agree with the trial court that the interview did not constitute custodial interrogation.

20

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
                                                            J.

We concur:

CODRINGTON _____
              Acting P. J.

FIELDS _____
                    J.